## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

LUCAS EIBENSTEINER, KARON ALONZO JEFFERSON and WESLEY GOLDEN, individually and on behalf of all others similarly situated,

               Plaintiffs,

v.

ESSILORLUXOTTICA USA INC. f/k/a ESSILOR OF AMERICA, INC., THE ESSILORLUXOTTICA ERISA COMMITTEE and JOHN DOES 1-10,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.:

## CLASS ACTION COMPLAINT

Plaintiffs, Lucas Eibensteiner, Karon Alonzo Jefferson, and Wesley Golden ("Plaintiffs"), by and through their attorneys, on behalf of the EssilorLuxottica Retirement Savings Plan 1 (f/k/a the Essilor of America Retirement Savings Plan[1]) (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include EssilorLuxottica USA Inc. (f/k/a Essilor of America, Inc.) ("EssilorLuxottica" or the "Company"), and the EssilorLuxottica ERISA Committee and its members during the Class Period (the "Committee").

---

[1] "Effective January 1, 2023, the Plan was amended to be sponsored by EssilorLuxottica USA, Inc., and the Plan was also renamed EssilorLuxottica Retirement Savings Plan 1." Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 6.

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. §
1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred
contributions from their salaries to the Plan. *See* Auditor's Report, attached to 2023 Form 5500 for
the Plan, at 6 ("The Plan is a defined contribution plan. . . . The Plan is subject to the provisions
of the Employee Retirement Income Security Act of 1974 (ERISA).").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary
duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act
"solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the
"care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.
29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma
Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of
Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at \*14 (W.D. Tex. 2011), *Main v.
American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

4.      The Department of Labor ("DOL") has also explicitly stated that employers are
held to a "high standard of care and diligence" and must, among other duties, "establish a prudent
process for selecting investment options and service providers."[3] *See also Tibble v. Edison Int'l*,
135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a
plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration
to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and
implementing strategies for the investment and management of trust assets, trustees are obligated
to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at
https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-
center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

7.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

10.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to pay reasonable fees for RKA services with respect to the Plan, and failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11.     At all times during the Class Period, the Plan had at least one-half of one billion dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $534,685,977 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

12.     By 2023, the Plan had $1,156,557,109 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

13.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

14.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 9,223 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 25,641 participants. *See* 2023 Form 5500 for the Plan, at 2.

15.     The marketplace for retirement plan services is established and competitive. Accordingly, as a jumbo plan, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent until it was too late. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services from 2019 through at least 2021.

4

16.    Defendants also caused the Plan to enter into an arrangement with Prudential Retirement Insurance and Annuity Company ("Prudential"), a party in interest, under which Prudential received millions of dollars in exchange for recordkeeping services and trustee services rendered to the Plan. Defendants' conduct was especially egregious given that Prudential received additional income from certain of the Plan's investment securities, described below. This arrangement with Prudential is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

17.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

18.    Specifically, Defendants allowed substantial assets in the Plan to be invested in a Guaranteed Income Fund ("Prudential[5] GIF"). The Prudential GIF carried significantly more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants.

19.    Prudential benefited significantly from Plan participants being invested in the Prudential GIF. The assets invested in the Prudential GIF were held and invested by Prudential, which kept the spread (the difference between the amount Prudential earned on the investments and the amount Prudential paid to Plan participants). The crediting rates that Prudential provided to investors in the Prudential GIF were/are so low that Prudential reaped a windfall on the spread.

---

[5] "The Plan has a benefit-responsive investment contract with Empower Annuity Insurance Company (formerly known as Prudential Retirement Insurance and Annuity Company)." Auditor's Report, attached to 2022 Form 5500 for the Plan, at 12.

20.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) failing to control the Plan's recordkeeping and administration costs; and (3) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

21.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

22.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violation of ERISA's prohibited transactions (Count III).

## II.    JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

24.     This Court has personal jurisdiction over Defendants because the Plan is administered in this District, meaning EssilorLuxottica transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for

nationwide service of process. Further, the Plan administrator, the EssilorLuxottica ERISA Committee, is located at 13555 N. Stemmons Fwy, Dallas, Texas.[6]

25.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because EssilorLuxottica does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

26.     Plaintiff, Lucas Eibensteiner ("Eibensteiner"), resides in Billings, Montana. During his employment, Plaintiff Eibensteiner participated in the Plan. Mr. Eibensteiner invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential GIF. In addition, Plaintiff Eibensteiner also suffered injury to his Plan account by paying excessive RKA costs.

27.     Plaintiff, Karon Alonzo Jefferson ("Jefferson") resides in The Colony, Texas. During his employment, Plaintiff Jefferson participated in the Plan. Mr. Jefferson invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential GIF. In addition, Plaintiff Jefferson also suffered injury to his Plan account by paying excessive RKA costs.

28.     Plaintiff, Wesley Golden ("Golden") resides in Lake Dallas, Texas. During his employment, Plaintiff Golden participated in the Plan. Mr. Golden invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the

---

[6] *See* EssilorLuxottica Retirement Savings Plan 1, 2023 Summary Plan Description ("SPD"), at 12.

Prudential GIF. In addition, Plaintiff Golden also suffered injury to his Plan account by paying excessive RKA costs.

**Defendants**

**Company Defendant**

29.    EssilorLuxottica USA Inc. (f/k/a Essilor of America, Inc.) is the Plan sponsor and a named fiduciary with a principal place of business at 12 Harbor Park Drive, Port Washington, New York.[7] *See* 2023 Form 5500 of the Plan, at 1. EssilorLuxottica is "a global leader in the design, manufacture and distribution of ophthalmic lenses, frames and sunglasses."[8]

30.    The Plan is administered by the EssilorLuxottica ERISA Committee, whose members are appointed by the Company's Board of Directors.

31.    EssilorLuxottica appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.    Accordingly, EssilorLuxottica during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

33.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

---

[7] From 2019 to 2022, the Plan sponsor, Essilor of America, Inc., was located at 13515 North Stemmons Freeway, Dallas, Texas. *See* 2019-2022 Form 5500, at 1.

[8] *See* https://www.linkedin.com/company/essilorluxottica/about/,  last accessed on August 29, 2025.

34.     As discussed above, EssilorLuxottica appointed the EssilorLuxottica ERISA Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services.

35.     The Committee "has sole and absolute discretionary authority to administer, interpret and construe the Plan's provisions, including making all determinations affecting the Plan and its participants (*e.g*., eligibility for participation, benefits and distributions, factual determination, etc.) and directing the Plan's Trustee to make various investment alternatives available." SPD, at 11-12; *see also* Auditor's Report, attached to 2023 Form for the Plan, at 6 ("The EssilorLuxottica ERISA committee controls and manages the operation and administration of the Plan.").

36.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

37.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.     CLASS ACTION ALLEGATIONS[9]

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g*., *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

38.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the EssilorLuxottica Retirement Savings Plan 1 (f/k/a the Essilor of America Retirement Savings Plan), at any time between September 9, 2019 through the date of judgment (the "Class Period").

39.    The members of the Class are so numerous that joinder of all members is impractical. The 2023 Form 5500 lists 25,641 Plan "participants with account balances as of the end of the plan year."  2023 Form 5500 at 2.

40.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

---

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.    Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

42.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

45.    The Plan is a defined contribution plan covering substantially all eligible employees of EssilorLuxottica. *See* Auditor Report, attached to 2023 Form 5500, at 6. ("The Plan is a defined

contribution plan. . . .  Effective January 1, 2023, employees are eligible to participate in the Plan for the purpose of making salary deferral contributions as soon as administratively practical."); *see also* SPD, at 13 ("[T]he Plan is a 'defined contribution' Plan.").

46.     Included in the Plan's available funds was the Guaranteed Income Fund offered by "Empower Annuity Insurance Company (formerly known as Prudential Retirement Insurance and Annuity Company) (EAIC). EAIC maintains the contributions in a general account." Auditor's Report, attached to 2022 Form 5500, at 10.

47.     At the end of 2019, $115,838,333 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 17.

48.     At the end of 2023, over $108 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2023 Form 5500 for the Plan, at 12.

49.     The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF |
|---|---|
| 2019 | $115,838,333 |
| 2020 | $124,626,126 |
| 2021 | $141,439,260 |
| 2022 | $139,482,939 |
| 2023 | $108,579,545 |

***Eligibility***

50.     In general, the Plan covers all employees of EssilorLuxottica. *See* SPD, at 2 ("You can generally elect to become a Participant for purposes of making Salary Deferral Contributions as soon as administratively practicable after being hired by EssilorLuxottica regardless of the number of hours you work.").

*Contributions*

51.    Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 4 ("Your decision to make Salary Deferral Contributions is voluntary. ... You can contribute any whole percentage of your Salary up to the limits described in the 'Limits on Salary Deferral Contributions' Section of this SPD.").

52.    EssilorLuxottica makes matching contributions after the participant has been employed for one year. *See* SPD, at 2 ("You will become a Participant for purposes of receiving Matching Contributions as soon as practicable after you complete one Year of Eligibility Service (1,000 Hours of Service) and reach age 21.").

53.    "EssilorLuxottica will make Matching Contributions for each calendar quarter based on Participants' Salary Deferral Contributions. Your Matching Contributions for a quarter will be equal to your Salary Deferral Contributions and Catch-Up Contributions for that quarter up to 6% of Your Salary for the quarter, subject to any applicable limits." SPD, at 5.

54.    Like other companies that sponsor 401(k) plans for their employees, EssilorLuxottica enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

55.    EssilorLuxottica also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

56.    Given the size of the Plan, EssilorLuxottica likely enjoyed significant tax and cost savings from offering a match.

## VI.  THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.  ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

57.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

58.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

59.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

60.    The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[11]

61.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central

---

[11] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."),
available    at    https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

62.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

63.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

64.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

65.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

66.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

67.    It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

68.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those

written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

69.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

70.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on March 20, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

71.    Plaintiffs did not receive a response to their initial request pursuant to Section 104(b)(4) of ERISA. On August 19, 2025, Plaintiffs sent a follow up request to the Plan administrator. As of the date of the filing of this complaint, Plaintiffs have not received a response to the follow-up request, and the Plan administrator has provided no documents pursuant to the Section 104(b)(4) of ERISA request.[12]

---

[12] Failure to provide Plan documents within thirty days of request is a violation of 29 U.S.C. § 1132(c)(1) and 29 U.S.C. § 1024(b)(4). Plaintiffs reserve the right to amend the instant Complaint to add a count for violation of the forgoing ERISA provisions.

72.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

73.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

74.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Prudential GIF**

75.    A stable value fund "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[13]  In other words, the overarching goal of all stable value funds is to preserve capital.

76.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to

---

[13] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[14]

77.     There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prudential GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

78.     "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[15]

79.     As indicated above, the Plan was invested in a proprietary stable value fund managed by Prudential, then Empower, the Prudential GIF.

80.     There are two significant problems with the Prudential GIF discussed below. First, the Prudential GIF is a traditional GIC and is structured as a general account, fixed annuity contract. As a general account product, the Prudential GIF thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

81.     The second related problem with the Prudential GIF is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

82.     Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

1.     **Prudential/Empower Pose A Severe Risk Of Becoming Insolvent**

---

[14] *Id*.

[15] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

a.    **The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable**

83.    Because a guaranteed insurance account product – like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

84.    A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

85.    The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[16]

---

[16] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

86.    These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

### b.    Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency

87.    Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

88.    An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:



| ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company | | |
|---|---|---|
| **LIABILITIES, SURPLUS AND OTHER FUNDS** | | |
| | 1 Current Year | 2 Prior Year |
| 28.  Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29.  Common capital stock | 2,500,000 | 2,500,000 |
| 30.  Preferred capital stock | | |
| 31.  Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32.  Surplus notes | 0 | |
| 33.  Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34.  Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35.  Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36.  Less treasury stock, at cost: | | |
| 36.1  ........ shares common (value included in Line 29 $ ........ ) | | |
| 36.2  ........ shares preferred (value included in Line 30 $ ........ ) | | |
| 37.  Surplus (Total Lines 31+32+33+34+35-36) (including $ ........ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38.  Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39.  Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus:  $    1,018,399,778   EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $  106,414,669,390   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:      0.96%**      National Average is About **7.5%.**

89.     There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | | |
|---|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | | |
| 30. | Preferred capital stock | | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | | |
| 32. | Surplus notes | | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | | |
| 34. | Aggregate write-ins for special surplus funds | | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | | |
| | 36.1 _____ shares common (value included in Line 29 $ _____ ) | | | |
| | 36.2 _____ shares preferred (value included in Line 30 $ _____ ) | | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | | 244,900,595,211 | 231,901,616,769 |

| | | | |
|---|---|---|---|
| **Total Surplus:** | $ | 26,427,441,247 | EAIC's 2024 Surplus to Liabilities |
| **Total Liabilities:** | $ | 218,473,153,964 | Ratio is Less Than 1%. The |
| **Surplus to Liabs Ratio:** | | **12.10%** | National Average is About **7.5%**. |

### c.     Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus

90.     Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

21



91.     Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



92.     The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

93.     The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[17]

94.     Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[18] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions.   *See* n. 17.

### d.     Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations

95.     Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion

---

[17]  *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

[18] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp

in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

96.     The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



97.     Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

98.     In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

## 2. There are Many GICs in the Marketplace with Competitive Crediting Rates

99.     There are other reasons besides the lack of creditworthiness why the Plan's fiduciaries should not have selected or maintained the Prudential GIF.

100.     The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

101.     Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

102.     The Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[19] |
|------|-----------|---------------------|-------------|-------------------|-------------------|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |

---

[19] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

25

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **EssilorLuxottica Plan** | **9,223** | **$534,685,977** | **Prudential GIF** | **2.16%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **EssilorLuxottica Plan** | **9,218** | **$588,408,151** | **Prudential GIF** | **1.89%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **EssilorLuxottica Plan** | **11,616** | **$735,762,028** | **Prudential GIF** | **1.58%** |

| | | | | | |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **EssilorLuxottica Plan** | **Unknown[20]** | **$924,832,170** | **Prudential GIF** | **1.68%** |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |

---

[20] The 2022 Form 5500 for the Plan did not identify the number of participants with account balances at the end of 2022.

| | | | | |
|---|---|---|---|---|
| Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| **EssilorLuxottica Plan** | **25,641** | **$1,982,716,271** | **Prudential GIF** | **Unknown[21]** |

103.    Throughout the Class Period, the Prudential GIF in the Plan underperformed the comparator funds by at least 54%, as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2019 | 2.16% | 3.94% | 45.18% |
| 2020 | 1.89% | 3.75% | 49.60% |
| 2021 | 1.58% | 4.19% | 62.29% |
| 2022 | 1.68% | 4.13% | 59.32% |
| 2023 | Unknown | 3.85% | Unknown |
| Average Underperformance during Class Period | | 3.85% | 54.10% |

104.    In short, because the Plan held between $500 million and $1.1 billion in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

**C.    Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the Plan and its Participants**

105.    During the Class Period, Defendants entered into a contract with Prudential to provide RKA and trustee services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

106.    29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

---

[21] No Schedule A was attached to the 2023 Form 5500. Plaintiffs could not calculate the crediting rate for the Prudential GIF for 2023.

constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

107. Here, Prudential was a party in interest to the Plan as it was receiving compensation for RKA and trustee services, as well as indirect compensation from the Plan in the form of revenue share being paid to Prudential from Prudential funds in the Plan.

### 1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

108. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

109. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G.     Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.     Participant education (e.g. newsletters, web articles, standard communication materials);

I.     Plan consulting (e.g., preapproved document services, operational materials);

J.     Plan consulting (e.g. preapproved document services, operational compliance support).

110.   This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

111.   The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

a.     Loan processing;

b.     Brokerage services/account maintenance (if offered by the plan);

c.     Distribution services; and

d.     Processing of qualified domestic relations orders.

112.   All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those

much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

113.    The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[22] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[23]

114.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

---

[22] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[23] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

115.    Recordkeepers for large 401(k) plans such as Fidelity, Vanguard, Prudential, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

116.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 2.    The Plan's Recordkeeping Fees were Excessive

117.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

118.    As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since well before the start of the Class Period up to at least 2021.

| Plan Year | Participants | Total RKA Reported | $PP |
|---|---|---|---|
| 2015 | 6,908 | $338,895 | $49.06 |
| 2016 | 7,086 | $421,073 | $59.42 |
| 2017 | 7,417 | $481,937 | $64.98 |
| 2018 | 7,730 | $416,221 | $53.84 |
| 2019 | 9,223 | $498,736 | $54.08 |
| 2020 | 9,218 | $492,033 | $53.38 |
| 2021 | 11,616 | $492,269 | $42.38 |
| 2022 | Unknown | $587,904 | |

119.    The above fees were excessive when benchmarked against similar plans.

120.    At all times during the Class Period a per participant fee in excess of $42 (the lowest per participant fee from 2019-2021) was unreasonable. As noted above, a DOL study concluded that "[b]asic per-participant administrative charges typically reflect minimum charges and sliding

scales that substantially reduce per capita costs as plan size increases." Accordingly, the larger the plan, the lower the recordkeeping fee should be. To put things into perspective, when comparing retirement plan data, most publications utilize tranches. For example, the leading publication that collects 401(k) data is BrightScope/ICI. It categorizes plans in the following tranches:

**EXHIBIT I.3**

**BrightScope Audited 401(k) Filings and the Universe of 401(k) Plans by Plan Assets**
Distribution of 401(k) plans, participants, and assets by plan assets, 2019

| | BrightScope audited 401(k) filings | | | Department of Labor 401(k) universe | | |
|---|---|---|---|---|---|---|
| Plan assets | Plans<br>Number | Participants<br>Thousands | Assets<br>Billions of dollars | Plans<br>Number | Participants<br>Thousands | Assets<br>Billions of dollars |
| Less than $1M | 2,980 | 731.8 | $1.5 | 336,744 | 5,675.6 | $104.7 |
| $1M to $10M | 25,183 | 6,504.8 | 123.2 | 225,598 | 13,607.0 | 691.6 |
| >$10M to $50M | 20,836 | 9,329.2 | 461.7 | 31,260 | 10,248.3 | 631.3 |
| >$50M to $100M | 3,962 | 4,498.4 | 277.2 | 4,213 | 4,659.1 | 294.1 |
| >$100M to $250M | 2,608 | 6,702.8 | 404.8 | 2,724 | 6,937.8 | 423.0 |
| >$250M to $500M | 1,121 | 5,085.3 | 391.5 | 1,176 | 5,293.8 | 410.5 |
| >$500M to $1B | 706 | 5,310.5 | 498.3 | 726 | 5,415.6 | 512.3 |
| More than $1B | 762 | 21,353.8 | 3,030.7 | 776 | 21,557.2 | 3,068.2 |
| All plans | 58,158 | 59,516.4 | 5,188.9 | 603,217 | 73,394.3 | 6,135.6 |

Note: BrightScope audited 401(k) filings generally include plans with 100 participants or more. Plans with fewer than four investment options or more than 100 investment options are excluded from BrightScope 401(k) filings for this analysis. Assets are fair market value at the year-end of the plan and include loans.
Source: BrightScope Defined Contribution Plan Database

*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2019 at Ex. 1.2, p. 7., available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

121.    Accordingly, the $500 million to $1 billion asset mark is significant as all plans between $500 million and $1 billion are considered in a category of their own.

122.    Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than their peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[24] |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |

---

[24] Unless otherwise noted, these fees are taken from the Form 5500.

| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
|---|---|---|---|---|---|---|---|
| **Prudential** | **EssilorLuxottica Plan** | **2019** | **$534,685,977** | **9,223** | **13 15 37 50 64** | **Yes - $0** | **$54** |

| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
|---|---|---|---|---|---|---|---|
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| Great-West | Viacom 401(k) Plan | 2020 | $1,747,213,865 | 12,469 | 15 37 50 64 | No | $37 |
| **Prudential** | **EssilorLuxottica Plan** | **2020** | **$588,408,151** | **9,218** | **13 15 37 50 64** | **Yes - $0** | **$53** |

| Vanguard | Crowe LLP Retirement Plan | 2021 | $1,021,351,197 | 6,840 | 15 33 37 99 | Yes - $0 | $27 |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2021 | $4,285,161,000 | 12,994 | 37 64 65 71 | No | $33 |
| **Prudential** | **EssilorLuxottica Plan** | **2021** | **$735,762,028** | **11,616** | **13 15 37 50 64** | **Yes - $0** | **$42** |

123.    The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees from 2019 through 2021.

124.    As of the end of 2021 there were only 1,011 (0.2%) 401(k) plans with more than $1 billion in plan assets. *See* https://www.ici.org/system/files/2023-09/23-rpt-dcplan-profile-

401k.pdf. The Plan's $50 per participant fee from 2019 to 2021 is 92% greater than the average fee of $26 per participant from 2019 to 2021 for the twelve (12) plans listed above.

125.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2021. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2021.

126.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $26 per participant, and likely even less.[25] This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

127.    Further, because Prudential was a party-in-interest and received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Prudential.

128.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(against the Committee)**

129.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

130.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A),

---

[25] For Plan year 2023, the Plan's recordkeeper was Fidelity and the per participant fees for recordkeeping services was $25. *See* Required Disclosure Information EssilorLuxottica Retirement Savings Plan 1, Produced on March 10, 2025 (attached as Exhibit "A"), at B3 ("Recordkeeping Fee - $25.00 per year deducted quarterly").

in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

131.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

132.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

133.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

134.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

135.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

136.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

137.    EssilorLuxottica (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

138.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

139.    The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

140.    The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

141.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

142.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**Prohibited Transactions**
**(Against All Defendants)**

143.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

144.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

145.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

146.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

147.    Defendants' decision to agree to pay excessive fees to Prudential as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

148.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: September 9, 2025                 Respectfully submitted,


**WARD + WHITE PLLC**
*Daniel L. White*
Daniel L. White, Esquire
TX Attorney ID #24090588
114 ½ E. Louisianna Street
Suite 206
McKinney, TX  75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 941-0040

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
(*Pro Hac Vice* to be requested)
James A. Maro, Esquire
(*Pro Hac Vice* to be requested)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com

jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiffs and the Putative Class*