**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LUCAS EIBENSTEINER, KARON ALONZO JEFFERSON, WESLEY GOLDEN and MATTHEW PITTS, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>ESSILORLUXOTTICA USA INC. f/k/a ESSILOR OF AMERICA, INC., THE ESSILORLUXOTTICA ERISA COMMITTEE and JOHN DOES 1-10,<br><br>Defendants. | Case No. 3:25-cv-02443-X<br><br>Judge Brantley Starr |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**


INTRODUCTION .... 1

RELEVANT FACTUAL BACKGROUND .... 3

I. The Plan And Its Stable Value Fund Investment. .... 3

II. The Plan's Recordkeeping Fees. .... 5

PLAINTIFFS' CLAIMS .... 6

ARGUMENT .... 7

I. Legal Standard. .... 7

II. Plaintiffs Still Do Not Plausibly Allege That The Committee Breached Its Fiduciary Duty Of Prudence By Offering The GIF As An Investment Option In The Plan. .... 7

A. The SAC Still Does Not Allege Facts That The Purported Comparators Are A Meaningful Benchmark For The Challenged GIF. .... 8

B. The SAC Does Not Allege Facts That Prudential's Financial Condition Rendered The GIF An Imprudent Investment. .... 13

C. The SAC Still Fails To Allege Any Facts About The Committee's Fiduciary Process. .... 14

D. Plaintiffs' Reliance On The Stable Value Institute Of America "Benchmark" Does Not Save Their Claims. .... 16

III. Plaintiffs Do Not Plausibly Allege That The Plan's Recordkeeping Fees Were Excessive Or Imprudent. .... 18

A. Plaintiffs' Attempt To Add A New Theory Of Liability Exceeds The Scope Of The Court's Order Granting Leave To Amend. .... 18

B. Even If This Theory Were Properly Before The Court, Plaintiffs Nonetheless Fail To Plausibly Allege The Plan's Process For Monitoring Recordkeeping Fees Was Imprudent. .... 19

IV. Plaintiffs' Failure To Monitor Claim Fails As A Matter Of Law. .... 25

CONCLUSION .... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. CMFG Life Ins. Co.*,
2024 WL 307489 (W.D. Wis. Jan. 26, 2024) ....17

*Anderson v. Intel Corp. Inv. Pol'y. Comm.*,
137 F.4th 1015 (9th Cir. 2025) ....12, 15

*Anderson v. Intel Corp. Inv. Pol'y. Comm.*,
579 F. Supp. 3d 1133 (N.D. Cal. 2022), *aff'd*, 137 F.4th 1015 (9th Cir. 2025) ....18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....7

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) ....10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....7

*Bloom v. AllianceBernstein L.P.*,
725 F. Supp. 3d 325 (S.D.N.Y. 2024) ....17

*Brewer v. Alliance Coal, LLC*,
2025 WL 3527171 (N.D. Okla. Dec. 9, 2025) ....24, 25

*Clinton v. Baxter Int'l Inc.*,
2025 WL 3470685 (N.D. Ill. Dec. 3, 2025) ....10

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ....4

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ....18

*Eibensteiner v. EssilorLuxottica USA Inc.*,
2026 WL 1140895 (N.D. Tex. Apr. 27, 2026) .... *passim*

*Ellis v. Fidelity Mgmt. Tr. Co.*,
883 F.3d 1 (1st Cir. 2018) ....10

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ....7

*Forman v. TriHealth, Inc.*,
563 F.Supp. 3d 753 (S.D. Ohio 2021), *aff'd in relevant part*, 40 F.4th 443 (6th Cir. 2022) ....................17

*Glick v. ThedaCare, Inc.*,
2022 WL 16927749, at *6 (E.D. Wis. Oct. 27, 2022), *R&R adopted*, 2022 WL 16924188 (E.D. Wis. Nov. 14, 2022) ....................13

*Hall v. Cap. One Fin. Corp.*,
2023 WL 2333304 (E.D. Va. Mar. 1, 2023) ....................17

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023) ....................19

*Hughes v. Nw. Univ.*,
595 U.S. 170 (2022) ....................17

*Laabs v. Faith Techs., Inc.*,
2022 WL 17418358, at *5 (E.D. Wis. Nov. 9, 2022), *R&R adopted*, 2022 WL 17417583 (E.D. Wis. Dec. 5, 2022) ....................13

*Lalonde v. Mass. Mutual Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. Mar. 29, 2024) ....................15, 17, 24

*Locascio v. Fluor Corp.*,
2023 WL 320000 (N.D. Tex. Jan. 18, 2023) (Starr, J.) ....................1, 12

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) ....................10, 15, 18, 24

*Matousek v. MidAm. Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ....................12

*Metzler v. Graham*,
112 F.3d 207 (5th Cir. 1997) ....................2, 14

*Peeler v. Bayada Home Health Care, Inc.*,
2026 WL 208630 (W.D.N.C. Jan. 27, 2026) ....................22

*Perkins v. United Surgical Partners Int'l, Inc.*,
2024 WL 1574342 (5th Cir. Apr. 11, 2024) ....................19

*Phillips v. Cobham Adv. Elec. Sols., Inc.*,
2024 WL 3228097 (N.D. Cal. June 28, 2024) ....................15

*Pizarro v. Home Depot, Inc.*,
634 F. Supp. 3d 1260 (N.D. Ga. 2022), *aff'd* 111 F.4th 1165 (11th Cir. 2024) ....................10

*U.S. ex rel. Ruscher v. Omnicare, Inc.*,
2014 WL 2618158 (S.D. Tex. June 12, 2014) ....................19

*Sandoval v. Exela Enter. Sols., Inc.*,
2020 WL 9259108 (D. Conn. Mar. 30, 2020) ....................15

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024) ....................20

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ....................15

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013)....................15

*Steen v. Sonoco Prods. Co.*,
2025 WL 2420725 (D.S.C. June 4, 2025)....................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................4

*Twombly v. Bell Atl. Corp.*,
313 F. Supp. 2d 174 (S.D.N.Y. 2003)....................7

*Villareal v. Navistar, Inc.*,
2022 WL 14708977 (N.D. Tex. Mar. 8, 2022) (Starr, J.) ....................19

*White v. Chevron Corp.*,
2017 WL 2352137 (N.D. Cal. May 31, 2017) ....................16

**INTRODUCTION**

Plaintiffs allege that the EssilorLuxottica ERISA Committee (the "Committee") breached its fiduciary duty of prudence under the Employee Retirement Income Security Act of 1974 ("ERISA") by (1) offering the Guaranteed Income Fund (the "GIF") as the stable value fund investment option in the EssilorLuxottica Retirement Savings Plan 1 (the "Plan") from the start of the putative class period (September 9, 2019) through 2023, and (2) causing the Plan to pay allegedly "unreasonable" recordkeeping fees to Prudential Retirement Insurance and Annuity Company ("Prudential") from 2019-2021. Plaintiffs further allege that the Committee and EssilorLuxottica USA Inc. ("EssilorLuxottica" and, together with the Committee, "Defendants") breached their duty to monitor other fiduciaries. Each of Plaintiffs' claims fail.

**First**, as to the GIF, Plaintiffs' allegations in the Second Amended Complaint ("SAC") are largely indistinguishable from those the Court already rejected in the now-dismissed First Amended Complaint ("FAC"). Plaintiffs still fail to allege any "factual detail concerning the[] underlying structure, contractual terms, or specific risk exposures" of any of their alleged comparator stable value funds. *Eibensteiner v. EssilorLuxottica USA Inc.*, 2026 WL 1140895, at *3 (N.D. Tex. Apr. 27, 2026). Plaintiffs contend once again that every stable value fund is inherently a meaningful comparator for every other stable value fund, but the Court has already rejected that argument. *Id*. at *3 ("[S]imply labeling funds as comparable or a peer is insufficient to establish that those funds are meaningful benchmarks.") (quoting *Locascio v. Fluor Corp.*, 2023 WL 320000, at *6 (N.D. Tex. Jan. 18, 2023) (Starr, J.)).

Nor does the SAC address the second deficiency the Court identified as to the GIF claim—Plaintiffs' failure to place their allegations concerning Prudential's allegedly poor financial condition "in a broader comparative context" or to "connect these alleged risks to any particular deficiency in [the Committee's] selection or monitoring process." *Eibensteiner*, 2026 WL

1140895, at *4. Despite this Court's Order, the SAC regurgitates word-for-word the same allegations about Prudential's financial condition that Plaintiffs pled in the FAC. And the SAC is *silent* as to the financial condition of any of the insurers offering their alleged comparator stable value funds. Plaintiffs also make the same timing error they made in the FAC—they allege only facts about Prudential's financial condition as of December 31, 2024, but concede that the Plan no longer offered the GIF as of that date. But "[p]rudence is evaluated at the time of the investment without the benefit of hindsight." *Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997). Thus, financial data post-dating the GIF's inclusion in the Plan is irrelevant to evaluating the Committee's fiduciary process.

**Second**, as to the Plan's recordkeeping fees, Plaintiffs' claim is both procedurally improper and implausible. In granting Plaintiffs leave to amend, the Court stated that "[t]he changes to the second amended complaint are limited to those needed to cure the deficiencies identified by this Order." *Eibensteiner*, 2026 WL 1140895, at *5. A brand new theory of liability that was not at issue in the FAC and not evaluated by the Court in its prior Order plainly exceeds the scope of that authority, and this claim should be dismissed for that reason alone.

But even if Plaintiffs' recordkeeping fee claim were properly before the Court (and it is not), that claim fails as a matter of law. The SAC says nothing of the Committee's process for monitoring the Plan's recordkeeping fees. Instead, Plaintiffs ask the Court to infer that the Committee had a flawed process from the following alleged facts: (1) a handful of other plans purportedly paid lower recordkeeping fees than the Plan each year during 2019-2021; (2) the Plan's recordkeeping fees *decreased* over that same time period (allegedly from $54 per participant in 2019 to $42 per participant in 2021); (3) the Committee replaced Prudential with Fidelity as the Plan's recordkeeper in 2023 and further *reduced* the Plan's recordkeeping fee to $25 per

participant; and (4) an allegedly "reasonable" recordkeeping fee during the putative class period was $26 per participant. Those facts do not suggest any plausible inference of imprudence—to the contrary, they suggest that the Committee was paying attention to the Plan's recordkeeping fees and acted to reduce them over time just as one would expect a prudent fiduciary to do. And Plaintiffs' contention that the Plan's fees were "unreasonable" relative to a handful of comparators is fundamentally flawed insofar as their calculations: (1) ignore indirect recordkeeping fees; (2) disregard the impact of individually apportioned fees for so-called "ancillary" services that are charged only to participants who utilize those services; and (3) ignore differences in the services received by each plan.

Finally, Plaintiffs' failure to monitor claim is wholly derivative of their breach of fiduciary duty claims and should be dismissed for the same reasons.

The Court should dismiss the SAC in its entirety with prejudice.

## RELEVANT FACTUAL BACKGROUND

### I. The Plan And Its Stable Value Fund Investment.

EssilorLuxottica is a global leader in the design, manufacture, and distribution of ophthalmic lenses, frames, and sunglasses. SAC ¶ 24. EssilorLuxottica sponsors the Plan, which is a 401(k) defined-contribution plan. *Id.* ¶¶ 2, 24, 49. The Committee is the Plan Administrator with responsibility for selecting and monitoring the investments available to participants through the Plan. *Id.* ¶¶ 25-26. The set of investment options available to participants in a 401(k) plan is commonly referred to as a plan's "investment menu." *Id.* ¶ 71. Participants decide how to allocate their assets in the Plan among investments available in the Plan's investment menu. *See* App. 10 (Ex. 1) ("You can elect how you want to invest your Accounts among the Plan's investment

alternatives.").[1] The Plan offered participants "mutual funds and collective trusts that invest in a variety of securities and have different investment objections, returns, and risks." *Id*.

Relevant here, the Plan offered a stable value fund investment option called the GIF. SAC ¶ 41. The GIF was managed by Prudential Prudential, which subsequently changed its name to Empower Annuity Insurance Company ("Empower").[2] *Id*. Stable value funds are "conservative, fixed income investment vehicle[s] with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[3] Generally speaking, stable value funds are managed pursuant to Guaranteed Insurance Contracts ("GICs"). Am. Compl. ¶ 54. Just like there are different types of stock funds (e.g., domestic, international, growth, value, etc.), there are different types of stable value funds with different characteristics. These include synthetic GICs, separate account GICs, and general account GICs (also referred to as traditional GICs). *Id.* ¶ 56. The GIF was a general account GIC, and was backed by the full faith and credit of Prudential. *Id*. ¶¶ 80, 82. Despite repleading, the

[1] The SPD is cited and quoted in the SAC. SAC ¶¶ 18 n. 7, 30, 40. At the Rule 12(b)(6) stage, the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) ("[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."). Thus, the Court may properly consider the exhibits attached hereto, which consist of various Plan-related documents as well as publicly-available filings.

[2] This name change occurred in 2022. SAC ¶ 14 n. 6. Plaintiffs use the names Empower, Prudential, and even "Prudential/Empower" interchangeably, but Defendants refer to the relevant entity as Prudential throughout this brief.

[3] *See* SAC ¶ 53 n. 12, citing, incorporating and linking ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, *available at* https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions (last visited June 29, 2026).

SAC still does not allege *any* facts about the holdings, risks, investment strategy, liquidity restrictions, or termination provisions of the GIF.

The GIF provided participants with a contractual guarantee of principal and accrued interest. SAC ¶ 54. Throughout the putative class period, the GIF offered a contractual guaranteed "floor" of between 1.00 – 2.00% (depending on the year). App. 24, 29, 35, 40, 45 (Ex. 2).[4] Plan assets invested in the GIF did not lose any principal and were guaranteed to grow at a contractual rate of return at or above the negotiated floor. In every year during the putative class period, the GIF provided a crediting rate in excess of the contractual floor. SAC ¶¶ 137-50.

The Plan's investment in the GIF was liquidated during 2024. SAC ¶ 103 n. 21; App. 51 (Ex. 2). As of December 31, 2024, the Plan no longer had any investment in the GIF. App. 52 (Ex. 2) (showing no investment in the GIF).

## II. The Plan's Recordkeeping Fees.

Prior to January 1, 2023, Prudential served as the Plan's recordkeeper. SAC ¶¶ 14, 200-01. Effective January 1, 2023, Fidelity became the recordkeeper. *Id.* ¶ 204 n. 38. Plaintiffs do not challenge the Plan's fee arrangement with Fidelity and, instead, allege only that the Plan's recordkeeping fees paid to Prudential during 2019-2021 were unreasonable. *See id.* ¶¶ 200-03.

Plaintiffs allege two broad categories of recordkeeping services. **First**, they claim there are "bundled" services consisting of a variety of "essential" recordkeeping services such as, e.g., basic account recordkeeping, daily participant transaction accounting, payroll services, and others. SAC ¶¶ 173-74. According to Plaintiffs, these "bundled" services "do not affect the amount charged by recordkeepers." *Id.* ¶ 174. **Second**, there are "a la carte" services that are utilized and charged "on

[4] The Plan's annual reports, also known as "Form 5500s," are cited and quoted throughout the SAC. *See, e.g.,* SAC ¶¶ 2, 7-9, 24 and n. 8, 41-43.

a participant-by-participant basis" for services such as loan processing, brokerage services, distributions, and processing qualified domestic relations orders ("QDROs"). *Id.* ¶¶ 175, 188. According to Plaintiffs, since fees for a la carte services are incurred on a participant-by-participant basis, they are "negligible" when evaluating plan-level aggregate recordkeeping fees.

Plaintiffs contend that the primary factor in determining the amount a plan should pay for recordkeeping services is the number of participants in the plan. *See* SAC ¶ 177 ("recordkeeping expenses are driven by the number of participants in a plan"). The SAC alleges the Plan had the following numbers of participants and recordkeeping fees each year from 2019-2021:

| Year | # of Participants | Fee (per participant) |
|---|---|---|
| 2019 | 9,223 | $54 |
| 2020 | 9,218 | $53 |
| 2021 | 11,616 | $42 |

SAC ¶¶ 196, 200-01. Plaintiffs also allege the Plan had between $535 million – $736 million in assets during 2019-2021 but maintain that "recordkeeping costs are not affected by account size." *Id.* ¶¶ 195, 200-01. Plaintiffs identify seven alleged comparator plans—out of thousands of plans—that they contend paid between $5 - $37 per participant, for an average of $26 per participant, for recordkeeping services during 2019-2021. SAC ¶¶ 200-01, 204. Plaintiffs concede the Plan paid less than $26 per participant starting in 2023. *Id.* ¶ 204 n. 38.[5]

**PLAINTIFFS' CLAIMS**

In Count I, Plaintiffs claim the Committee breached its fiduciary duty of prudence by (1) offering the allegedly "poor" performing GIF as an investment in the Plan when other stable value funds performed better, and (2) allowing the Plan to pay allegedly "unreasonable" recordkeeping fees during 2019-2021. SAC ¶¶ 207-13.

[5] Plaintiffs do not allege what the Plan paid for recordkeeping services in 2022 and do not allege that the Plan's recordkeeping fee in 2022 was unreasonable.

In Count II, Plaintiffs claim that EssilorLuxottica breached its duty to monitor the Committee's actions with respect to the Plan. *Id*. ¶¶ 214-20.

## ARGUMENT

### I. Legal Standard.

To survive dismissal under Rule 12(b)(6), Plaintiffs' SAC "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Whether a complaint states a plausible claim is context-specific and requires more than offering conclusory allegations devoid of factual support. *Id.*; *accord Eibensteiner*, 2026 WL 1140895, at *2. Moreover, charts and numbers alone cannot defeat a motion to dismiss. After all, the Supreme Court first articulated the now-governing Rule 12(b)(6) standard in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), where the Court affirmed dismissal of a complaint that included color-coded maps of various territories that purportedly "evidence[d] the degree to which the defendants operate[d] in separate markets." *Twombly v. Bell Atl. Corp.*, 313 F. Supp. 2d 174, 182 (S.D.N.Y. 2003). Those maps, even if accurate, did not amount to "allegations plausibly suggesting (*not merely consistent with*) agreement" in violation of the antitrust laws. *Twombly*, 550 U.S. at 557 (emphasis added).

The Supreme Court has emphasized that Rule 12(b)(6) is an "important mechanism for weeding out meritless [ERISA] claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

### II. Plaintiffs Still Do Not Plausibly Allege That The Committee Breached Its Fiduciary Duty Of Prudence By Offering The GIF As An Investment Option In The Plan.

The Court previously found Plaintiffs' claim that the Committee breached its duty of prudence by offering the GIF as an investment option in the Plan was implausible for two reasons. **First**, Plaintiffs failed to plausibly allege that their purported comparator investments were

"meaningful benchmarks" for the GIF. *Eibensteiner*, 2026 WL 1140895, at *3. **<u>Second</u>**, Plaintiffs' allegations concerning Prudential's "financial condition" were acontextual and disconnected from any supposed deficiency in the Committee's fiduciary process. *Id*. at *4. The SAC suffers from the same deficiencies, which Plaintiffs have made no meaningful attempt to rectify.

### A. The SAC Still Does Not Allege Facts That The Purported Comparators Are A Meaningful Benchmark For The Challenged GIF.

In the FAC, Plaintiffs alleged their comparator stable value funds were meaningful benchmarks for the GIF because they were:

> (1) fully-benefit responsive, (2) structured so that the insurer cannot terminate the contract prematurely, (3) subject to regular rate review, (4) issued by creditworthy insurers, and (5) that the managers of the comparator investments did not believe circumstances would arise that could limit transactions at contract value and therefore contend that the risk profiles of those investments were comparable.

*Eibensteiner*, 2026 WL 1140895, at *3. The Court rejected those allegations as "high-level and [] wanting for substantial factual detail concerning their underlying structure, contractual terms, or specific risk exposures." *Id*. Undeterred, Plaintiffs reassert the *exact same* allegations in the SAC. *See* SAC ¶¶ 105-06, 113 (identifying the same alleged shared characteristics). The only "new" allegation (if it can even be called that) is the conclusory assertion that "all stable value products have nearly identical investment strategies" insofar as stable value funds generally aim "to preserve income." *Id*. ¶ 100. Of course, that theory was implicit in Plaintiffs' prior complaint, briefed extensively by the parties (*see* ECF No. 25 at 9-14; ECF No. 29 at 10-13; ECF No 30 at 3-6), and rejected by the Court. *See Eibensteiner*, 2026 WL 1140895, at *3 ("Simply labeling funds as comparable or a peer is insufficient to establish that those funds are meaningful benchmarks.").

Moreover, the allegation that every stable value fund is automatically a meaningful comparator for every other stable value fund is inconsistent with other allegations in Plaintiffs' SAC. For example, Plaintiffs contend there are two "important consideration[s]" for evaluating

different stable value fund products: (1) "the contract terms" and (2) "the insurer's financial strength rating." SAC ¶ 80. Of course, if these (and other) factors distinguish stable value funds from each other and should be considered when choosing between stable value funds, then it cannot be that *every* stable value fund is inherently a *meaningful* benchmark for every other.

Regardless, Plaintiffs' allegation that all stable value funds have "nearly identical investment strategies" relies on far too high of a level of abstraction and does not stand up to scrutiny. SAC ¶ 100. To say that the goal of every stable value fund is to "preserve income" is no different than to say that the goal of every mutual fund is to generate returns. That may be true in the abstract, but the way in which each individual mutual fund goes about achieving that goal may differ significantly—different mutual funds focus on different market sectors or industry sectors, utilize passive or active management, take on more or less risk, etc. So too with stable value funds which, in the case of general account or "traditional" stable value funds (like the GIF), rely on the insurer's general account portfolio which may vary significantly from insurer to insurer in terms of the makeup of the portfolio, the level of risk the insurer is willing to take on, the types of assets accrued and the ratio among different asset-types, etc.[6] And that's not to even mention significant contractual differences between stable value funds with respect to factors such as minimum guaranteed crediting rates, frequency of rate-setting, liquidity and withdrawal restrictions, etc.

But even accepting that the goal of every stable value fund is to preserve income, Plaintiffs do not allege that the GIF ever failed to meet that goal. To the contrary, Plaintiffs concede that the

[6] Indeed, Plaintiffs concede as much, alleging that the GIF's crediting rate is set based on "the expected and actual experience of a reference portfolio within the issuer's general account" and that participants in the GIF receive "earnings on the underlying investments" in the general account. SAC ¶ 57. This fact is further implicit in Plaintiffs' allegations about Prudential's "financial condition," wherein they acknowledge that the risk of the GIF and its expected and actual returns rely on the investment strategy inherent in Prudentia's general account.

GIF maintained principal and provided a positive rate of return to participants every year during the putative class period. SAC ¶¶ 137-51. There is, therefore, no basis to infer imprudence. *See, e.g.*, *Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1299 (N.D. Ga. 2022), *aff'd* 111 F.4th 1165 (11th Cir. 2024) ( "Plaintiffs' focus on returns to assess the prudence of a stable value fund is conceptually flawed, particularly since it is undisputed that the [challenged fund] never lost money for participants during the [c]lass [p]eriod"); *Barchock v. CVS Health Corp.*, 886 F.3d 43, 49, 53 (1st Cir. 2018) (affirming dismissal of a claim that a stable value fund was imprudent where the plaintiffs did *not* contend that the stable value fund had failed to meet the "objective of preserving capital while outperforming money market funds").[7]

At the end of the day, the SAC suffers from the same deficiencies that resulted in the Court dismissing Plaintiffs' claims previously. Plaintiffs once again allege no "substantial factual detail concerning the[] underlying structure, contractual terms, or specific risk exposures" of the GIF or any of their purported comparators. *Eibensteiner*, 2026 WL 1140895, at *3. Indeed, the SAC is completely devoid of any factual allegations concerning the characteristics of twelve of Plaintiffs' seventeen purported comparator stable value funds.[8] With respect to their five "representative

---

[7] *See also Ellis v. Fidelity Mgmt. Tr. Co.*, 883 F.3d 1, 10 (1st Cir. 2018) (affirming summary judgment in favor of defendants on imprudence claims challenging stable value fund where "[i]t is undisputed that the [challenged stable value fund's] returns exceeded those of money market funds throughout the class period" and "plaintiffs make no argument that offering [even] more conservative investments (such as money market funds) would constitute an ERISA violation").

[8] Twelve of Plaintiffs' purported comparators are included only sporadically in Plaintiffs' performance charts (some appearing in only a single year between 2019-2023). Any claim based on those twelve comparators must be dismissed for two independent reasons. **First**, the SAC is silent as to their characteristics, meaning they are not plausibly alleged to be *meaningful* comparators for the GIF. *E.g.*, *Eibensteiner*, 2026 WL 1140895, at *3 ("imprudence cannot be inferred based solely on allegations identifying the existence of . . . better performing alternative funds") (quoting *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1154 n.15 (10th Cir. 2023)). **Second**, such sporadic performance comparisons are insufficient to state a plausible claim. *See Clinton v. Baxter Int'l Inc.*, 2025 WL 3470685, at *7 (N.D. Ill. Dec. 3, 2025) (dismissing duty of prudence claim with respect to stable value fund investment where plaintiffs "fail[ed] to identify

examples," Plaintiffs merely regurgitate the same high-level characteristics that their prior complaint relied on and that the Court previously rejected. *Compare* SAC ¶¶ 105-06, 113 *with* FAC ¶¶ 100, 105.

Plaintiffs' five "representative examples" are further distinguishable, rendering them inapt comparators for the GIF. Notably, four of these five comparators are investment products that were managed by a corporate affiliate of the plan sponsor for the plan in which they were offered. *See* SAC ¶¶ 113, 137, 140, 143, 146, 149 (stable value funds offered in the Auto-Owners Insurance Company Retirement Savings Plan, Ameritas 401(k) Retirement Plan, Standard 401(k) Plan, and Transamerica 401(k) Retirement Savings Plan each offered by a corporate affiliate of the plan sponsor). Plaintiffs offer no allegations whatsoever to suggest that those same investment products at those same rates were available to the broader market of retirement plans. As Plaintiffs acknowledge, stable value funds are creatures of contract, and the contract terms are one of the two "most important consideration[s]" for fiduciaries when evaluating a stable value fund. SAC ¶ 80. It is entirely reasonable to expect that the contractual terms available to an affiliated entity may be more favorable than the terms for that same investment product that are available to the broader market. Plaintiffs offer nothing to suggest that the Plan, as an unaffiliated entity to any of the insurers offering these four stable value funds, would be able to secure similarly favorable contractual terms for these products. Nor do they allege any facts about, e.g., their holdings, risks, investment strategy, liquidity provisions, withdrawal provisions, termination provisions, investment guidelines, etc.

---

a uniform sample" because "a rotating cast of other funds with higher crediting rates . . . cannot support a claim of imprudence").

The remaining "representative example[]"—the investment offered by the Ford Foundation Retirement Plan (the "Ford Plan")—is not even a stable value fund. The Ford Plan offered the TIAA Traditional Annuity, which is a "guaranteed fixed annuity contract" and *not* a stable value fund. App. 58-59 (Ex. 3).[9] The TIAA Traditional Annuity is offered "through a variety of contract types" subject to participant choice, some of which are "not considered fully-benefit responsive." *Id*. at 35. Each individual participant's choice as to which contract type to select "determines the applicability of certain account features" which are not uniform across participants within the plan. *Id*. The GIF contains no such options. And, unlike a stable value fund, "a participant's accumulation in the TIAA Traditional Annuity is converted to a lifetime payout annuity." *Id*. at 36. In short, the TIAA Traditional Annuity is a materially different type of investment product, with materially different characteristics, and not a meaningful comparator for the GIF.

Ultimately, the theory that was implicit in the FAC—that the purported comparators are meaningful benchmarks simply by virtue of also having "stable value" in the name—is now explicit in the TAC. *See* TAC ¶¶ 100, 107. But numerous courts—including this one—have rejected such conclusory "category-wide" allegations as insufficient to state a plausible claim for breach of fiduciary duty. *Eibensteiner*, 2026 WL 1140895, at *3 ("[S]imply labeling funds as comparable or a peer is insufficient to establish that those funds are meaningful benchmarks") (citations and quotations omitted); *Locascio*, 2023 WL 320000, at *6 (same); *Anderson v. Intel Corp. Inv. Pol'y. Comm.*, 137 F.4th 1015, 1023 (9th Cir. 2025) (same); *Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (undefined peer groups and broad categories of

[9] The Form 5500 filings for the Ford Foundation Retirement Plan are cited and quoted in the SAC. *See* SAC ¶¶ 113-14.

investments that are "missing details" such as "whether they hold similar securities, have similar investment strategies, and reflect a similar risk profile" are not sufficient to meet the meaningful benchmark pleading standard).[10] In short, Plaintiffs' breach of fiduciary duty claim premised on the GIF should be dismissed for the same reasons this Court previously elucidated, this time with prejudice.

### B. The SAC Does Not Allege Facts That Prudential's Financial Condition Rendered The GIF An Imprudent Investment.

In the FAC, Plaintiffs alleged that "Prudential's financial condition, such as its surplus-to-liabilities ratio and use of offshore reinsurance, presented risks relevant to the prudence of the investment." *Eibensteiner*, 2026 WL 1140895, at *4. The Court rejected those allegations as acontextual and untethered from the Committee's fiduciary process. As the Court explained:

> Even accepting these allegations as identifying potential risk considerations, the amended complaint does not place them in a broader comparative context. Plaintiffs do not allege whether these conditions were atypical within the industry, materially different from those of insurers offering the comparator products, or how those factors would have affected a prudent fiduciary's decision-making. Nor do Plaintiffs connect these alleged risks to any particular deficiency in EssilorLuxottica's selection or monitoring process.

*Id*. Plaintiffs do not even attempt to remedy these deficiencies and, instead, simply reassert word-for-word the same allegations about Prudential's financial condition. *Compare* SAC ¶¶ 82-96 *with* FAC ¶¶ 82-96. Still absent from the SAC is any allegation about whether Prudential's financial condition was "atypical within the industry, materially different from those of insurers offering the

---

[10] *See also Laabs v. Faith Techs., Inc.*, 2022 WL 17418358, at *5 (E.D. Wis. Nov. 9, 2022), *R&R adopted*, 2022 WL 17417583 (E.D. Wis. Dec. 5, 2022) (dismissing claim challenging the prudence of stable value fund investment where "[t]he complaint in this case alleges merely that the [purported comparator] was a materially similar and less expensive stable value fund"); *Glick v. ThedaCare, Inc.*, 2022 WL 16927749, at *6 (E.D. Wis. Oct. 27, 2022), *R&R adopted*, 2022 WL 16924188 (E.D. Wis. Nov. 14, 2022) (same).

comparator products, or how those factors would have affected a prudent fiduciary's decision-making." *Eibensteiner*, 2026 WL 1140895, at *4.

The *only* relevant addition Plaintiffs made to the SAC is the conclusory allegation that "each of the comparator insurance companies, described below, offering GICs with higher crediting rates than the Prudential GIF had higher Surplus to Liabilities Ratios (defined above as S/L) than Prudential." SAC ¶ 98. But the SAC is silent as to what the S/L ratio actually is for any of the purported comparators, the degree of difference between those companies' ratios and Prudential's, or how those ratios compared to the market writ large. The Court need not accept as true "conclusory statements[] or naked assertions devoid of further factual enhancement" like this one. *Eibensteiner*, 2026 WL 1140895, at *2.

Nor do Plaintiffs bother to address the timing issue that Defendants previously identified with respect to their allegations about Prudential's financial condition—Plaintiffs only allege facts about Prudential's financial condition as of December 31, 2024, but it is undisputed that the GIF was no longer an investment option in the Plan as of that date. *See* SAC ¶¶ 82-96, 103 n.21. Accordingly, the information Plaintiffs premise their claims on was not available to the Committee "at the time of the investment" and is therefore irrelevant to evaluating whether the Committee's fiduciary process was prudent or not. *Metzler*, 112 F.3d 207 at 209.

### C. The SAC Still Fails To Allege Any Facts About The Committee's Fiduciary Process.

The SAC pays lip service to the fiduciary process, contending that a prudent process for selecting and monitoring stable value fund investments "requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market, by, among other things, issuing requests for information and proposals from competing GIC providers." SAC ¶ 66. But Plaintiffs ultimately say nothing of the process actually followed by the Committee here.

Instead, they maintain that, since the GIF allegedly underperformed a handful of alternative stable value funds, the Committee's process must have been deficient. *See id.* ¶¶ 100-03. That is insufficient to state a plausible claim because "imprudence cannot be inferred based solely on allegations identifying the existence of . . . better performing alternative funds." *Eibensteiner*, 2026 WL 1140895, at *3 (quoting *Matney*, 80 F.4th at 1154 n.15); *accord Anderson*, 137 F.4th at 1021 (it is "not enough for a plaintiff simply to allege that the fiduciaries could have obtained better results . . . by choosing different investments"); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) ("Nor does a showing of imprudence come down to simply pointing to a fund with better performance"); *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (allegation that "better investment opportunities were available at the time of the relevant decisions" was insufficient to plausibly allege breach of fiduciary duties).[11]

Moreover, as discussed above, although Plaintiffs acknowledge the relevance and importance of considering "the terms and conditions of the GIC contracts" as part of a prudent fiduciary process, they nonetheless allege no facts about those contractual terms for the GIF or any of the purported comparators. SAC ¶ 66; *supra* at 8-13. And the allegation that the Committee did not take the monitoring steps espoused by Plaintiffs is entirely conclusory and contradicted by

[11] *See also Phillips v. Cobham Adv. Elec. Sols., Inc.*, 2024 WL 3228097, at *8 (N.D. Cal. June 28, 2024) ("federal courts have widely and consistently rejected attempts to impose ERISA liability where the claims are based solely on a fund's underperformance") (cleaned up). Courts have applied this same principle to other stable value fund challenges. *See Lalonde v. Mass. Mutual Ins. Co.*, 728 F. Supp. 3d 141, 156-57 (D. Mass. Mar. 29, 2024) (dismissing stable value fund challenge on Rule 12 motion because "simply selecting two alleged comparator funds with higher credit return rates over a seven-year period is the type of hindsight-based allegation which is insufficient to support a plausible inference of breach"); *Sandoval v. Exela Enter. Sols., Inc.*, 2020 WL 9259108, at *7 (D. Conn. Mar. 30, 2020) (dismissing stable value fund challenge on Rule 12 motion because "comparison of credit ratings and fees . . . does not support an inference that the defendants breached their fiduciary duties").

Plaintiffs' own allegation that "after 2023, the Plan selected another stable value fund." SAC ¶ 103 n.21. Allegations, such as these, that the fiduciary removed a challenged fund "create a plausible inference that the Plan fiduciaries *were* attentively monitoring the Fund." *White v. Chevron Corp.*, 2017 WL 2352137, at *20 (N.D. Cal. May 31, 2017) (emphasis added).

### D. Plaintiffs' Reliance On The Stable Value Institute Of America "Benchmark" Does Not Save Their Claims.

Plaintiffs further allege that the GIF underperformed relative to "all stable value funds" relying on a study performed by the Stable Value Institute of American ("SVIA"). SAC ¶¶ 156-59. That allegation is flawed for several reasons.

**First**, the study spanned "[f]rom January 2010 through December 2019." SAC ¶ 156. But that almost entirely predates the putative class period (September 9, 2019, to present), rendering it largely irrelevant to the question of whether the Committee acted prudently by offering the GIF as a Plan investment during the statute of repose period. Moreover, the study provides only an aggregate figure for that entire time period and says nothing of the performance of "all stable value funds" during the approximate quarter-of-a-year that overlaps with the putative class period.

**Second**, Plaintiffs misinterpret the article they rely on. It states only that "stable value assets in [retirement] plans grew at a compound annual rate of 4.1%." SAC ¶ 156. Plaintiffs interpret that 4.1% to be the average annualized rate of return for "all stable value funds," ignoring that by looking at asset growth on the whole it necessarily includes new monies invested in stable value funds over that time period (net of outflows) as well as growth attributable to performance. Indeed, the very article Plaintiffs rely on notes that "[d]uring the 10-year period studied by the SVIA, both stable value funds and intermediate-term bond funds produced 3% annualized

returns."[12] That 3% annualized return is less than one-percentage-point higher than the annualized rate of return Plaintiffs calculate for the GIF over roughly the same time period.[13] *See* SAC ¶ 135 (calculating 2.12% average rate of return for the GIF from 2011-2018). And it is lower (by nearly the same magnitude) than Plaintiffs' cherry-picked comparators over the same time period. *Id.* (calculating 3.80% average rate of return for the comparators from 2011-2018). And that makes sense—by virtue of being an average of "all stable value funds" there are necessarily going to be funds that land above and below that average, all while being within the "range of reasonable judgments a fiduciary may make." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

**Third**, courts routinely reject comparisons to category-wide benchmarks or averages because a plan cannot invest in an "average" investment and such averages mask differences among the underlying investments that make up that category. As one court explained in the context of target-date fund investments, benchmarks such as these are "a composite of the disparate strategies and styles present in the broad universe of investable alternative" investments, representing "an amalgamation of the different characteristics of [investment] strategies" and "because they reflect disparate investment strategies and styles" they "are not meaningful benchmarks." *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *7 (E.D. Va. Mar. 1, 2023);

---

[12] https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last accessed June 29, 2026). *See* SAC ¶ 156, n.30 (citing, incorporating, and linking this article).

[13] Numerous courts have found that differentials of similar (or even greater) magnitude fail to state a plausible claim for breach of fiduciary duty. *E.g.*, *Lalonde*, 728 F. Supp. 3d at 148, 156-57 (dismissing claim where alleged comparator stable value funds outperformed challenged fund by between .75% and 2.5%); *Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 340-41 (S.D.N.Y. 2024) (underperformance of up to 4.57% did not "create a plausible inference of misconduct and thereby state a claim for imprudence"); *Abel v. CMFG Life Ins. Co.*, 2024 WL 307489, at *5 (W.D. Wis. Jan. 26, 2024) (underperformance of "0.2% to around 5%" did not plausibly allege imprudence); *Forman v. TriHealth, Inc.*, 563 F.Supp. 3d 753, 764 (S.D. Ohio 2021) (finding underperformance ranging from 1.00% to "just over" 2.00% was "simply too small" to raise a plausible breach of fiduciary duty claim), *aff'd in relevant part*, 40 F.4th 443 (6th Cir. 2022).

*accord Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 n.4 (8th Cir. 2020) (rejecting comparison to benchmark index; "it is not a fund" that the plan could invest in); *Matney*, 80 F.4th at 1157 (rejecting comparison to "average" fees, explaining "the [complaint] 'makes a leap' based on averages 'that is too far removed to create anything more than the 'mere possibility' of misconduct"); *Anderson v. Intel Corp. Inv. Pol'y. Comm.*, 579 F. Supp. 3d 1133, 1150-51 (N.D. Cal. 2022) ("it is insufficient for an average to be a meaningful benchmark"), *aff'd*, 137 F.4th 1015 (9th Cir. 2025).

## III. Plaintiffs Do Not Plausibly Allege That The Plan's Recordkeeping Fees Were Excessive Or Imprudent.

In the FAC, Plaintiffs alleged that Defendants engaged in a prohibited transaction under ERISA Section 406(a)(1), 29 U.S.C. § 1106(a)(1), by paying recordkeeping fees to Prudential, an alleged party in interest. FAC ¶¶ 170-75 (Count IV). The Court dismissed that claim, explaining that "the collection of a contractually determined fee is not a transaction under 1106(a)" and, therefore, to state a plausible claim "Plaintiffs must allege that Prudential was a party in interest at the time of the relevant transaction," which they had failed to do. *Eibensteiner*, 2026 WL 1140895, at *4. Plaintiffs have abandoned that claim and now assert a *new* claim that the Committee breached its fiduciary duty of prudence by allowing the Plan to pay purportedly excessive recordkeeping fees. *E.g.*, SAC ¶ 210. That claim is both procedurally improper and implausible.

### A. Plaintiffs' Attempt To Add A New Theory Of Liability Exceeds The Scope Of The Court's Order Granting Leave To Amend.

In granting Plaintiffs leave to amend their complaint, the Court explicitly limited the scope of amendment to "those [changes] needed to cure the deficiencies identified by this Order." *Eibensteiner*, 2026 WL 1140895, at *5. Plaintiffs ignore that limitation and now allege an entirely new theory of liability, claiming that the Committee breached its fiduciary duty of prudence by allowing the Plan to pay purportedly "excessive" recordkeeping fees from 2019-2021. *E.g.*, SAC

¶¶ 197-98, 210. That theory was not pled in the FAC and, therefore, the Court did not consider it (or identify any deficiencies with respect to it) in dismissing the FAC. Nor is this entirely new theory of liability "needed to cure the deficiencies" identified by the Court with respect to Plaintiffs' now-abandoned prohibited transaction claim. Whether the Plan's recordkeeping fees were "excessive" relative to a handful of other retirement plans is irrelevant to the question of whether "Prudential was a party in interest at the time of the relevant transaction"—the only deficiency this Court identified with respect to Plaintiffs' earlier recordkeeping fee-related prohibited transaction claim. *Eibensteiner*, 2026 WL 1140895, at *4. Accordingly, Plaintiffs' new theory exceeds the scope of the Court's Order and should be dismissed. *Villareal v. Navistar, Inc.*, 2022 WL 14708977, at *3 (N.D. Tex. Mar. 8, 2022) ("'It is beyond cavil that the Court may strike claims that exceed the scope of its order granting leave.' The Court can also dismiss any portions of the amended complaint that were not permitted.") (Starr, J.) (quoting *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 2014 WL 2618158, at *32 (S.D. Tex. June 12, 2014)).

### B. Even If This Theory Were Properly Before The Court, Plaintiffs Nonetheless Fail To Plausibly Allege The Plan's Process For Monitoring Recordkeeping Fees Was Imprudent.

"[F]or this claim to survive dismissal, the Plaintiffs must have 'pleaded sufficient facts to render it plausible that the Committee incurred unreasonable recordkeeping fees ***and*** failed to take actions that would have reduced such fees." *Perkins v. United Surgical Partners Int'l, Inc.*, 2024 WL 1574342, at *4 (5th Cir. Apr. 11, 2024) (quoting *Hughes v. Nw. Univ.*, 63 F.4th 615, 631 (7th Cir. 2023)) (emphasis added). Here, Plaintiffs fail to plausibly allege either component.

**First**, as to the reasonableness of the Plan's fees, Plaintiffs allege only that, from 2019-2021, seven other retirement plans (out of hundreds of thousands across the country) paid lower recordkeeping fees than the Plan. SAC ¶¶ 200-01. But Plaintiffs do not plausibly allege a like-for-like comparison to plans that received similar recordkeeping services at a similar quality. For

starters, Plaintiffs calculate the recordkeeping fees for the Plan and each of the alleged comparators solely based on the "direct" recordkeeping fees reported in each plan's Form 5500 filings. *Compare*, *e.g.*, App. 32 (Ex. 2) (reporting $492,269 in "direct" compensation paid to Prudential which, when divided by the 11,616 reported participants at year-end yields an estimated recordkeeping fee of $42) *with* SAC ¶¶ 200-01 (alleging the Plan paid $42 per participant in 2021). But Plaintiffs acknowledge that the majority of their comparator plans also paid indirect fees to their recordkeepers. SAC ¶¶ 200-01. They neglect, however, to provide any estimate of the indirect fees paid either by the Plan or any of their comparators, meaning they are not comparing the *total* recordkeeping fees paid by the plans. *Id.* "[T]he comparison of direct costs alone provides limited insight into whether *total* recordkeeping fees paid by the Plaintiffs were excessive, as compared to other plans," and fails to state a plausible claim for imprudence. *Singh v. Deloitte LLP*, 123 F.4th 88, 95 (2d Cir. 2024).

Similarly, although Plaintiffs acknowledge that some of the fees paid by the Plan to Prudential were for "ancillary a la carte services" rather than so-called "bundled" recordkeeping services, they dismiss such ancillary fees as "negligible." SAC ¶ 188. The Plan's 404a-5 disclosures—which Plaintiffs acknowledge they relied upon (*see* SAC ¶ 186)—undermine that contention.[14] For example, the Plan's 2021 404a-5 disclosure informed participants that the asset-based fee they paid in 2021 for recordkeeping services was 0.04%. App. 62 (Ex. 4). Multiplied by the Plan's 2021 year-end assets of $735,762,028, that yields a recordkeeping fee of $294,305 which, when divided by the number of participants at year-end, yields a per-participant recordkeeping fee of $25 per participant, well in line with Plaintiffs' proposed comparators. SAC

[14] Plaintiffs attached a copy of the Plan's 2025 404a-5 disclosure as an exhibit to the SAC. *See* ECF No. 35-1.

¶¶ 200-01. The remainder of the "direct" fees paid to Prudential in 2021—just under $200,000—were for the sort of "ancillary a la carte services" that Plaintiffs dismiss as "negligible," things like loan processing and maintenance fees, distribution fees, qualified domestic relations order fees, etc. *Id.* ¶ 188; App. 62 (Ex. 4). Those fees, incurred "on a participant-by-participant" basis, are plainly not "negligible" in the aggregate, as Plaintiffs mistakenly suggest. SAC ¶ 188.

A simple example highlights the error in Plaintiffs' theory as to these ancillary services. Per the Plan's 2021 Form 404a-5 disclosure, participants with outstanding loans against their Plan account were charged a $50 annual loan maintenance fee. App. 62 (Ex. 4). If only 10% of Plan participants in 2021 had an outstanding loan (roughly 1,160 participants), then the total loan maintenance fees charged to participants in the Plan would be $58,000.[15] Rolled into the Plan's total recordkeeping fee and calculated on a per-participant basis as Plaintiffs have, that inflates the Plan's per-participant fee by approximately $5 per participant. But that is a fallacy—only the participants who actively decide to take a loan against their Plan account are charged that loan maintenance fee, but Plaintiffs are nonetheless using those individual participants' decisions and individually-apportioned fees to inflate the average fee paid by all participants in the Plan, including those with *no* loan against their account (who, therefore, pay no loan maintenance fee). More importantly, Plaintiffs do not even allege that they themselves took loans against their Plan

---

[15] 10% may be a conservative example, as some studies have found as many as 15-20% of 401(k) plan participants have a loan out against their account at any given point in time, subject to variation by industry, broader economic conditions, etc. *See* Lu, T., Mitchell, O., Utkus, S., Young, J., *Borrowing From the Future? 401(k) Plan Loans and Loan Defaults*, Nat'l Tax J., 2017 Mar, 70(1):77-110 (finding that "20% of workers borrow at any given time") (available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6781879/); Holden, S., Bass, S., Copeland, C., *401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2022*, Employee Benefits Research Institute, Issue Brief No. 606, Apr. 30, 2024 (finding "15 percent of 401(k) participants who were eligible for loans had loans outstanding against their 401(k) plan accounts") (available at https://www.ebri.org/docs/default-source/pbriefs/ebri_ib_606_k-xsec-30apr24.pdf?sfvrsn=1f43072f_1).

accounts or utilized any of the other ancillary services that generate fees on an individual participant basis. In other words, Plaintiffs provide no reason to believe that they paid any more than the base recordkeeping fee for "bundled" services—approximately $25 in 2021 as explained above. It is disingenuous for Plaintiffs to inflate the average per-participant fee by including fees for ancillary services that they do not allege they ever used or were ever charged for. Moreover, Plaintiffs allegations are silent as to the type, usage, or cost of similar ancillary services received by their comparator plans—so it is impossible to evaluate what proportion of the fees paid by those comparators are attributable to "bundled" recordkeeping services versus "a la carte" recordkeeping services, which vary depending on the rate of utilization of each participant population.

In addition to the ancillary services that Plaintiffs attempt to gloss over, Plaintiffs concede that the Plan reported receiving services under code 13 ("Contract Administrator" services) each year from 2019-2021.[16] SAC ¶¶ 188, 200-01. But none of the alleged comparator plans reported receiving that same service. And the SAC is silent as to the nature, quality, or cost of the Contract Administrator services received by the Plan or how such services differed from the services received by any of the alleged comparators. That further undermines any suggestion that the Plan overpaid for services comparable to those received by the comparator plans. *See Peeler v. Bayada Home Health Care, Inc.*, 2026 WL 208630, at *9 (W.D.N.C. Jan. 27, 2026) (finding no meaningful comparison for recordkeeping fee claim where the Form 5500 filings for the plan at issue "include[] service code '13,' but none of the alleged comparator plans' Form 5500s include[] that code" and emphasizing that "[p]laintiffs nowhere explain this discrepancy or allege any facts that could help resolve it"). Moreover, outside of a vague and conclusory allegation that each of the

[16] https://www.dol.gov/sites/dolgov/files/ebsa/pdf_files/2020-instructions.pdf at 27 (last accessed June 29, 2026).

top 10 recordkeepers on the market "are all capable of providing the same quality of service," Plaintiffs say nothing about the quality of recordkeeping services actually received by the Plan or any of the alleged comparators. SAC ¶ 194.

A careful look at Plaintiffs' own alleged data points reveals the flaws in their theory. Take, for example, the recordkeeping fees paid by the Optumcare Management LLC 401(k) Retirement Savings Plan (the "Optumcare Plan") and the PG&E Corporation Retirement Savings Plan (the "PG&E Plan") in 2020. Both plans used the same recordkeeper—Fidelity—and reported largely the same services in their Form 5500 filings. SAC ¶¶ 200-01. The only service differential reported is that the Optumcare Plan reported an additional service (code 60, which translates to "[s]ub-transfer agency fees"). *Id*.[17] The Optumcare Plan also had approximately 2,500 fewer participants than the PG&E Plan. So, under Plaintiffs' theory where "bundled" recordkeeping services are "basic and fungible," "ancillary a la carte services" are "negligible" in terms of aggregate fees, every plan receives essentially the same quality of services regardless of individual circumstances, and the number of participants is the primary driver of fees, one would expect the PG&E Plan—receiving one fewer service and having 2,500 more participants—to be considerably cheaper than the Optumcare Plan. SAC ¶¶ 173-75, 177-78, 188, 194. But just the opposite is true—the PG&E Plan costs $10 *more* per participant than the Optumcare Plan *Id*. ¶¶ 200-01. Thus, some other factor not alleged (or, perhaps, dismissed as "negligible" by Plaintiffs) *must* drive differences in recordkeeping fees besides numbers of participants. Plaintiffs' theory is simply implausible.

**<u>Second</u>**, as to the Committee's process for monitoring recordkeeping fees, Plaintiffs summarize their theory as follows:

---

[17] https://www.dol.gov/sites/dolgov/files/ebsa/pdf_files/2020-instructions.pdf at 27 (last accessed June 29, 2026).

> Here, based on the fact that the Plan paid the same exorbitant amounts in recordkeeping fees throughout the Class Period, even though the general trend in the market has seen a decrease in recordkeeping fees over the last decade, there is little to suggest that Defendants conducted a [Request for Proposal], or at least an effective one, at reasonable intervals to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

SAC ¶ 192. But the factual allegations paint a *vastly* different picture of the Plan's recordkeeping fees and the Committee's process than this allegation would suggest. Plaintiffs concede that the Plan's recordkeeping fees from 2022 forward were *reasonable*: the $25 per participant fee instituted in 2023 was *lower* than Plaintiffs' alleged "reasonable" fee of $26 per participant. *See id.* ¶¶ 203-04 & n.38. The notion that "the Plan paid the same exorbitant amounts in recordkeeping fees throughout the Class Period" is false based on Plaintiffs' own allegations. *Id.* ¶ 192.

Relatedly, even before the Plan reached Plaintiffs' (unsupported and cherry-picked) $26 "reasonable" fee, the Plan's recordkeeping fees were decreasing. As alleged, the Plan's recordkeeping fees decreased from $54 per participant in 2019, to $53 per participant in 2020, to $42 per participant in 2021. SAC ¶ 196. Contrary to Plaintiffs' account, the Plan's fees reflected the "general trend in the market" of a "decrease in recordkeeping fees." *Id.* ¶ 192. That downward trend suggests the Committee was prudently monitoring (and negotiating reductions to) the Plan's recordkeeping fee. *See, e.g.*, *Matney*, 80 F.4th at 1156 (affirming dismissal where plaintiff's allegations "show[ed] the [p]lan's recordkeeping fees became cheaper over time"); *Brewer v. Alliance Coal, LLC*, 2025 WL 3527171, at *7 (N.D. Okla. Dec. 9, 2025) (dismissing breach of fiduciary duty claim where "[a]ccording to plaintiffs' own allegations, the RKA fees it alleges participants paid decreased over time"); *Lalonde*, 728 F. Supp. 3d at 157 ("It is implausible to infer breach of fiduciary duty from an alleged $13 *decline* in recordkeeping expenses."). That steady decrease stands in contrast to Plaintiffs' alleged comparators, which saw *increasing* recordkeeping

fees over the same period. The Optumcare Plan's fees increases from $19 in 2020 to $28 in 2021, and the PG&E Plan's fees increased from $29 in 2020 to $33 in 2021. Compl. ¶ 200.

Further, Plaintiffs concede that the Committee *replaced* Prudential with Fidelity as the Plan's recordkeeper in 2023 and, in so doing, negotiated a recordkeeping fee *below* Plaintiffs' alleged "reasonable" fee (and below most of their alleged comparator plans' recordkeeping fees). *Id.* ¶¶ 203-04 & n.38. This suggests the Committee did exactly what Plaintiffs allege they should have—evaluated the "general marketplace" of recordkeeping service providers, selected one of the "top ten recordkeepers in the marketplace," and negotiated a "significant reduction" to recordkeeping fees. *Id.* ¶¶ 181-82, 193-94. But even if the Committee hadn't taken those steps, "courts have consistently held that ERISA does not impose a fiduciary duty to conduct regular competitive bidding for recordkeeping services." *Steen v. Sonoco Prods. Co.*, 2025 WL 2420725, at *4 (D.S.C. June 4, 2025). So, the conclusory allegation that the Committee failed to do so, particularly when combined with allegations that the Plan's recordkeeping fees decreased over the relevant time period and reached a level that even Plaintiffs concede was "reasonable," cannot state a plausible claim for fiduciary breach. *See Brewer*, 2025 WL 3527171, at *7 ("plaintiffs' allegation that defendants' fail[e]d to solicit proposals to secure lower fees is unavailing" where allegations demonstrated recordkeeping fee reductions over the relevant time period).

## IV. Plaintiffs' Failure To Monitor Claim Fails As A Matter Of Law.

Plaintiffs allege that EssilorLuxottica failed to adequately monitor the Committee. SAC ¶¶ 214-20. That claim is derivative of the fiduciary breach claim and "necessarily fails because the underlying breach of fiduciary duty claim[] fails." *Eibensteiner*, 2026 WL 1140895, at *4.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court dismiss Plaintiffs' claims in their entirety and with prejudice.

Dated: June 30, 2026

Respectfully Submitted,

*/s/ Sean K. McMahan*

Sean K. McMahan (Tex. Bar No. 24130831)
MORGAN, LEWIS & BOCKIUS LLP
1717 Main Street, Suite 3200
Dallas, TX 75201
214-466-4000
214-466-4001 (fax)
sean.mcmahan@morganlewis.com

Jeremy P. Blumenfeld (*pro hac vice*)
2222 Market Street
Philadelphia, PA 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
jeremy.blumenfeld@morganlewis.com

Keri L. Engelman (*pro hac vice*)
Mathew J. McKenna *(pro hac vice)*
One Federal Street
Boston, MA 02110
Tel: (617) 341-7700
Fax: (617) 341-7701
keri.engelman@morganlewis.com
mathew.mckenna@morganlewis.com

*Counsel for Defendants EssilorLuxottica USA Inc. and the EssilorLuxottica ERISA Committee*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on June 30, 2026, a true and correct copy of the foregoing document was filed via the Court's CM/ECF System, which will provide electronic notice to all counsel of record.

*/s/ Sean K. McMahan*