**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| LUCAS EIBENSTEINER, KARON ALONZO JEFFERSON and WESLEY GOLDEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>ESSILORLUXOTTICA USA INC. f/k/a ESSILOR OF AMERICA, INC., THE ESSILORLUXOTTICA ERISA COMMITTEE and JOHN DOES 1-10,<br><br>Defendants. | **CIVIL ACTION NO.: 3:25-cv-02443-X** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS


I. INTRODUCTION ........................................ 1

II. BACKGROUND ........................................ 2

A. Backdrop of the Action ........................................ 2

B. Defendants Failed to Prudently Monitor the Prudential GIF ........................................ 3

C. Defendants Failed to Prudently Monitor the Plan's RKA Fees ........................................ 6

III. ARGUMENT ........................................ 9

A. Standard of Review ........................................ 9

B. The GIC Claims are Plausible ........................................ 10

i. The benchmarks are meaningful in the GIC context ........................................ 10

ii. The SAC alleges imprudent GIC monitoring processes ........................................ 18

C. Plaintiffs Sufficiently State Their RKA Fee Allegations ........................................ 20

i. The amended pleadings are plausible ........................................ 20

ii. The Comparator Plans are meaningful ........................................ 21

iii. The SAC alleges imprudent RKA monitoring processes ........................................ 24

D. Plaintiffs Plausibly Allege their Duty to Monitor Claim ........................................ 25

IV. CONCLUSION ........................................ 25

**TABLE OF AUTHORITIES**

PAGE(S)

**Cases**

*Alas v. AT&T Inc.*,
2026 WL 1671492 (C.D. Cal. June 4, 2026) ........ 21

*Allen v. GreatBanc Tr. Co.*,
835 F.3d 670 (7th Cir. 2016) ........ 18, 19

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
137 F.4th 1015, 1030-31 (9th Cir. 2025)
*cert. granted sub nom.*,
2026 WL 120679 (U.S. Jan. 16, 2026) ........ 15, 17

*Anderson v. Sw. Airlines Co.*,
2026 WL 820860 (N.D. Tex. Mar. 25, 2026) ........ 25

*Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ........ 10

*Barchock v. CVS Health Corp.*,
No. 16-cv-061 (D.R.I. Aug. 2, 2016) ........ 15

*Barchock v. CVS Health Corp.*,
2017 WL 9324762 (D.R.I. Jan. 31, 2017),
*R. & R. adopted*,
2017 WL 1382517 (D.R.I. Apr. 18, 2017),
*aff'd*, 886 F.3d 43 (1st Cir. 2018) ........ 15, 16

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ........ 16, 19, 22

*Brewer v. All. Coal, LLC*,
2025 WL 3527171 (N.D. Okla. Dec. 9, 2025) ........ 25

*Brotherston v. Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018) ........ 16, 17

*Bullock v. Smith*,
2008 WL 294544 (N.D. Miss. Jan. 31, 2008) ........ 21

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ........ *Passim*

*Carter v. Sentara Healthcare Fiduciary Comm.*,
No. 25-cv-16, 2025 WL 2427614 (E.D. Va. Aug. 11, 2025) ("*Carter I*") ........................ 16, 18, 19

*Cina v. Cemex, Inc.*,
2025 WL 2294331 (S.D. Tex. Aug. 8, 2025) ........................................................................ 22

*Clinton v. Baxter Int'l Inc.*,
No. 25-CV-3368, 2025 WL 3470685 (N.D. Ill. Dec. 3, 2025) .................................................. 15

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025)............................................................................................................ 3, 13

*Dayak v. Reyes Holdings, LLC*,
2026 WL 881653 (N.D. Ill. Mar. 31, 2026) ..................................................................... 23, 24

*Disselkamp v. Norton Healthcare, Inc.*,
2019 WL 3536038 (W.D. Ky. Aug. 2, 2019) ......................................................................... 19

*Dupree v. Prudential Ins. Co. of Am.*,
2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) .......................................................................... 14

*Eibensteiner v. Essilorluxottica USA Inc.*,
No. 3:25-CV-2443-X, 2026 WL 1140895 (N.D. Tex. Apr. 27, 2026) ................................1, 10, 11

*Ellis v. Fidelity Management Trust Co.*,
883 F.3d 1 (1st Cir. 2018) ..................................................................................................... 16

*Fezer v. Lockheed Martin Corp.*,
2026 WL 1041276 (D. Md. Apr. 16, 2026)............................................................................. 17

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)................................................................................................................. 6

*Fuller v. SunTrust Banks, Inc.*,
2019 WL 5448206 (N.D. Ga. Oct. 3, 2019)........................................................................... 20

*Glick v. ThedaCare, Inc.,*
2022 WL 16927749 (E.D. Wis. Oct. 27, 2022)...................................................................... 16

*Greenwald v. Cantrell*,
2023 WL 8827768 (E.D. La. Dec. 21, 2023)......................................................................... 20

*Hughes v. Nw. Univ.*,
595 U.S. 170, 176 ("*Hughes I*")........................................................................ 1, 10, 18, 24

*Hughes v. Nw. Univ.*,
63 F.4th 615 (7th Cir. 2023) ("*Hughes II*")............................................................. 10, 19, 21, 24

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
892 F.3d 719 (5th Cir. 2018) ("*Innova Hosp.*") ........................................................... 3, 5, 13, 20

*Johnson v. Parker-Hannifin Corp.*,
122 F.4th 205 (6th Cir. 2024)..........................................................................................*Passim*

*Jolley v. Texas Ass'n of Realtors, Inc.*,
2008 WL 11333898 (W.D. Tex. Aug. 25, 2008) ................................................................... 8

*Konya v. Lockheed Martin Corp*.
No. CV 24-750, 2025 WL 962066 (D. Md. Mar. 28, 2025) ................................................ 18, 19

*Laabs v. Faith Techs., Inc.*,
2023 WL 9321358 (E.D. Wis. Aug. 30, 2023).................................................................... 16

*Laborers Nat. Pension Fund v. N. Tr. Quantitative Advisors, Inc.*,
173 F.3d 313 (5th Cir. 1999) ...........................................................................................11

*Lacrosse v. Jack Henry & Assocs.*,
No. 23-cv-05088, 2024 WL 3564575 (W.D. Mo. July 11, 2024) ................................... 12, 14, 16

*Lalonde v. Mass. Mut. Ins. Co.*,
728 F. Supp. 3d 141 (D. Mass. 2024) ............................................................................ 19, 25

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) .......................................................................................... 25

*Mator v. Wesco Distribution, Inc.*,
102 F.4th 172 (3d Cir. 2024) ...........................................................................................*Passim*

*McDonald v. Lab'y Corp. of Am. Holdings*,
2023 WL 4850693 (M.D.N.C. July 28, 2023) ..................................................................... 14

*Meiners v. Wells Fargo & Co.*, 8
98 F.3d 820 (8th Cir. 2018)...........................................................................................10, 11, 14

*Miller v. AutoZone, Inc.*,
No. 19-cv-02779, 2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) ............................... 12, 13, 19

*Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) ............................................................................................ 10

*Payne v. Hormel Foods Corp.*,
24-CV-545, 2024 WL 4228613 (D. Minn. Sept. 18, 2024) ........................................ 12, 16, 17, 19

*Peeler v. Bayada Home Health Care, Inc.*,
2026 WL 208630 (W.D.N.C. Jan. 27, 2026) ..................................................................... 23

*Perkins v. United Surgical Partners Int'l, Inc.*,
No. 23-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024) ................................................*Passim*

*Rodriguez v. Hy-Vee, Inc.*,
2022 WL 16648825 (S.D. Iowa Oct. 21, 2022) ................................................................. 22

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) .................................................................................................. 18

*Sandoval v. Exela Enter. Sols., Inc.*,
2020 WL 9259108 (D. Conn. Mar. 30, 2020) .................................................................... 19

*Schuster v. Swinerton Inc.*,
2025 WL 1069887 (N.D. Cal. Apr. 8, 2025) ............................................................... 20, 23

*Silva v. Evonik Corp.*,
2020 WL 12574912 (D.N.J. Dec. 30, 2020) ...................................................................... 25

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024) ............................................................................................... 22

*Somers v. Cape Cod Healthcare, Inc.*,
2024 WL 4008527 (D. Mass. Aug. 30, 2024) ........................................................ 14, 16, 17, 24

*Spence v. Am. Airlines, Inc.*,
718 F. Supp. 3d 612 (N.D. Tex. 2024) .............................................................................. 10
*Stewart v. Nextera Energy, Inc.*, , 25
2025 WL 3098085 (S.D. Fla. Aug. 14, 2025) ............................................................ 22, 23, 24

*Sweda v. Univ. of Pennsylvania*,
923 F.3d 320 (3d Cir. 2019) .............................................................................................. 25

*Tibble v. Edison Int'l*,
575 U.S. 523, (2015) ("*Tibble I*") ................................................................................ 9, 20

*Ulch v. Se. Grocers LLC*,
2026 WL 1243069 (M.D. Fla. May 6, 2026) ..................................................................... 22

*In re Unisys Sav. Plan Litig.*,
74 F.3d 420 (3d Cir. 1996) ("*Unisys*") ...................................................................... 12, 19

*U.S. ex rel. Mathews v. HealthSouth Corp.*,
332 F.3d 293 (5th Cir. 2003) .......... 20

*Villareal v. Navistar, Inc.*
2022 WL 14708977 (N.D. Tex. Mar. 8, 2022) .......... 21

*Walter v. Kerry Inc.,*
2022 WL 1720095 (E.D. Wis. May 27, 2022) .......... 17

*Wood v. Prudential Ret. Ins.*,
2016 WL 5940946 (D. Conn. Sept. 19, 2016) ("*Wood I*") .......... 13, 19

**Statutes**

29 U.S.C. § 1104(a) .......... 24

29 U.S.C. § 1104(a)(1)(B) .......... 10

**Other Sources**

The Employee Retirement Income Security Act of 1974 *Passim*

Plaintiffs respectfully submit this Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. *See* Dkts. 38-40 ("MTD").[1]

## I. INTRODUCTION

The Supreme Court and Fifth Circuit have made clear that when ERISA "fiduciaries fail to" rectify excessive recordkeeping and administrative ("RKA") fees, and/or "remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ*., 595 U.S. 170, 176 ("*Hughes I*"); *accord Perkins v. United Surgical Partners Int'l, Inc*., No. 23-10375, 2024 WL 1574342, at **4-5 (5th Cir. Apr. 11, 2024). That is the case here. Properly reading the "the allegations as a whole" using a "context specific" approach, *id*., at 177, it is more than plausible that Defendants had imprudent fiduciary processes. *See* Second Amended Complaint ("SAC"), Dkt. 35. Given the Plan's substantial size, Defendants possessed significant market power to negotiate for better rates and superior products in a marketplace that was highly competitive for both GICs and recordkeeping and administrative ("RKA") fees. *Id*. ¶¶ 7-9, 42-44, 101, 154, 163, 177, 206. The SAC adds data spanning from nearly a decade before the Class Period to allege that any action taken toward the end of the Class Period "was too little too late." *Id*. ¶ 103 n.21. Indeed, this case is not merely about excessive fees or underperformance.

Crucially, the uncompensated risk of the Prudential Guaranteed Income Fund ("Prudential GIF"), as a general account GIC, is the keystone of Plaintiffs' process allegations and provides important context for the alleged comparisons. Defendants ignore these paramount allegations as well as new allegations that cure the deficiencies found by this Court's prior order. *See Eibensteiner v. Essilorluxottica USA Inc*., No. 3:25-CV-2443-X, 2026 WL 1140895 (N.D. Tex. Apr. 27, 2026).

[1] This brief assumes familiarity with the Parties, Plan, and all undefined terms as defined in prior briefings.

The SAC, however, does retain the same theories of liability, Article III injury, and comparators regarding excessive RKA fees, while adding more allegations regarding Defendants' imprudent processes. The SAC simply transitions the excessive RKA fee claim into the preexisting prudence claim while eliminating the counts for prohibited transactions. For this reason, and because discovery has not begun, Defendants cannot claim prejudice or any other reason for striking the new allegations.

Defendants' speculative and misleading fact arguments are neither correct nor relevant at this stage. Worse yet, all of Defendants' arguments are foreclosed by precedent, especially arguments pertaining to RKA fees and services, the role of contract terms at the pleading stage, and the role of uncompensated risk in annuity transactions. For these reasons and more, Defendants' motion to dismiss should be denied in its entirety.

## II. Background

### A. Backdrop of the Action

The SAC narrows Plaintiffs' case to two counts: (I) breach of the fiduciary duty of prudence, and (II) failure to monitor fiduciaries. The SAC fortifies imprudence allegations surrounding the Prudential GIF and the Plan's excessive RKA fees, while keeping the same theory of relief and eliminating the two prior counts for prohibited transactions under § 406(a), including the § 406(a) claim regarding RKA fees. *See* Exhibit A, Redline Comparison of the First Amended Complaint and SAC ("Redline"), at 77-83. In accordance with this Court's prior order, the SAC adds detailed GIF allegations about semiannual opportunities for improved rates, Comparator Plan terms, a longer period of underperformance, more robust comparisons, marketwide data, and surplus-to-liabilities allegations. As to recordkeeping, the SAC expands allegations regarding Defendants' process failures. *Crucially, the Comparator Plan chart, industry research support,*

*allegedly reasonable fee, and allegations that "for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees from 2019 through 2021" are identical to the prior complaint. See id*., 73-76.

Likewise, facts regarding Defendants' internal decision-making remain exclusively with Defendants. After Plaintiffs requested documents under ERISA § 104(b)(4), Defendants refused to provide investment management contracts (such as for the Prudential GIF), meeting minutes, or investment policy statements. SAC ¶¶ 75–76. The Fifth Circuit instructs that, in ERISA cases, "when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc*., 892 F.3d 719, 730 (5th Cir. 2018) ("*Innova Hosp*.") (it is an error to require facts that ERISA plaintiffs unsuccessfully attempted to obtain from the defendants); *Cunningham v. Cornell Univ*., 604 U.S. 693, 705 (2025). Plaintiffs draw reasonable inferences from many sources. *Id*., ¶ 78.

**B. Defendants Failed to Prudently Monitor the Prudential GIF**

Unlike mutual funds, GICs are contracts that are defined by their predictability; they offer a set return on investment irrespective of management style; and their associated risk level, which sets return expectations, is a creature of their structural design rather than their investment strategy. SAC ¶¶ 55. Indeed, competitive returns are an important goal, and expectations of GICs, in addition to offering more asset preservation than equity funds. *Id*., ¶ 55. The Prudential GIF "is a general account product that should have had a high crediting rate given its riskiness," and size-leverage, "yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans." *Id*., ¶ 110, *see*

*also* ¶¶ 12, 162. Defendants failed to recognize and rectify the Prudential GIF's severely uncompensated risk and wield the Plan's size in negotiations.

Because the marketplace for GICs is highly competitive, and all GICs are contract-based products that serve the role of asset protection *plus* competitive returns (unlike other asset protection products), prudent fiduciaries solicit competitive bids ("RFPs" or "RFIs"), negotiate for better rates, and evaluate an investment's relative performance, rather than just absolute performance, against comparable market options. *Id.*, ¶¶ 65-66, 100-02, 111, 115–16, 155. Defendants took none of these steps. ¶ 102. The belated switch to another GIC, and the terms of the Prudential GIF reinforce that Defendants' actions were "too little too late," and that Defendants were able to take the aforementioned prudent actions far earlier. *Id.*, ¶¶ 103 n.21, 104.

Per the Plan's 2022 Form 5500 Auditors' Report, the Prudential GIF was a fully benefit responsive general account GIC issued by Empower (formerly Prudential), where the "[i]nterest crediting rates are reviewed on a semiannual basis for resetting" and there were "no events that allow the issuer to terminate the contract and that require the plan sponsor to settle an amount different than contract value." *Id*. Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment for market value. *Id.*, ¶ 58.

Based on the specifics of the Prudential GIF, meaningful comparators include GICs "whose terms are, *inter alia*: (1) fully benefit-responsive; (2) whose contracts are with creditworthy insurance carriers; and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date;" and (4) "whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value." *Id.*, ¶ 59. All of the Comparator Funds used in the SAC meet this standard, with the five "Comparator Funds" that repeat year-over-year before and during the Class Period being more comparable, as demonstrated

through their Form 5500s, because their contracts are not publicly available. *Id*., ¶¶ 113-14, 119-37, 140-41, 143, 146, 149; *Innova Hosp*., 892 F.3d at 730. For instance, they had the same or more favorable terms for "terminat[ing] the agreements." *Id*., ¶ 113. The Ameritas, Standard, and Transamerica GICs are also general account GICs like the Prudential GIC. *Id*. The Ford GIC provides for a "a specified minimum rate of interest" that is "fully […] guaranteed by TIAA's claims-paying ability" as the insurer (*id*.), and is "reported at contract value" like the benefit-responsive Prudential GIF. Dkt. 40-4, App. 058.

There are also numerous other comparators used during the Class Period to show a broader prevailing marketplace, including GICs with less risk and bargaining power, that received higher returns despite the same goals of competitive rates and asset preservation as the Prudential GIF. *See* SAC ¶¶ 139–145, 148. Several of the other comparators also demonstrate that insurers offered better rates to unaffiliated plans than their own plans. *See, e.g., id*., ¶ 145 (in 2021, the American United Life Insurance Company gave its plan only a 3.87% rate, while the same year it gave the smaller Holzer Health System 401(a) Profit Sharing Plan a higher 4.02% rate). Every non-proprietary plan, where the insurance company was not the sponsor of the plan, had higher rates than what Prudential provided to the Plan. *Id*. The aforenoted GICs in the SAC also had a better Surplus to Liability ("S/L") Ratio than the Prudential GIF, showing another aspect of uncompensated risk for the Prudential GIF. *Id*., ¶ 98.

Year-by-year comparisons from 2011 through 2022 show the Prudential GIF lagged comparable GICs by 35% to 52% annually, resulting in average Class Period underperformance of 47%. *Id*., ¶¶ 117–52. The SAC now adds the Stable Value Institute of America ("SVIA") allegations, the "SVIA Benchmark," further confirming that the Prudential GIF underperformed the market, and that the Comparator Funds are not cherry picked for the best performing

alternatives. The SVIA Benchmark demonstrates that stable value assets grew at a 4.1% compound annual rate from 2010–2019 across 135,000 plans, necessarily including plans that are smaller than the Plan and investments that are less risky than the Prudential GIF. *Id.*, ¶¶ 7, 156, 206. The total amount of Plan assts invested in the Prudential GIF also grew each year, more than doubling from 2019 to 2023. *Id.*, ¶ 44. From 2011 through 2018, the Prudential GIF and Comparator Funds had average returns of 2.12% and 3.80% respectively. *Id.*, ¶ 157. From 2019 to 2023, the Comparator Funds had an average return of 3.54%, which is relatively conservative return compared to the 4.1% returns observed of the SVIA Benchmark while still outperforming the Prudential GIF. *Id.*, ¶ 158. Despite semi-annual opportunities to replace the Prudential GIF, Defendants waited over a decade to act, causing millions of dollars in losses. *Id.*, ¶¶ 35–36, 103, 161.

The Prudential GIF was backed by Empower/Prudential, an entity that engaged in offshore reinsurance arbitrage and maintained a thin S/L Ratio below 1% in 2024, well below the 7.5% national average and peer carriers like New York Life and the Comparator Funds. *Id.*, ¶¶ 87–99. The imprudence of these particular reinsurance practices are supported by warnings from the DOL, the SEC, a Reinsurance Fraud Expert testifying before Congress, Moody's, and the Financial Stability Oversight Council. *Id.*, ¶¶ 83-85, 92-93. Notably, the SAC alleges Empower took over for Prudential in 2022, and the S/L ratio issues started "before" Empower took over for Prudential, *i.e.*, throughout the Class Period, not just in 2024. *Id.*, ¶¶ 14n.6, 87. Defendants failed to leverage the Plan's massive assets to negotiate a higher rate to compensate for this default risk or to switch to superior alternative GICs. *Id.*, ¶¶ 97–104 (the "lack of adequate surplus" adversely affected the true "worth" of the Prudential GIF).

### C. Defendants Failed to Prudently Monitor the Plan's RKA Fees

Recordkeeping is a catchall term encompassing the standard suite of RKA services

provided by all national recordkeepers. *Id.* ¶ 172. These services include a bundled package of plan-wide administrative services provided for a single fee, as well as separate "A La Carte" (or "ad hoc") services charged based on individualized participant usage, such as loan processing, account maintenance, distribution services, and processing qualified domestic relations orders ("QDROs"). *Id.* ¶¶ 173-75. Hence, A La Carte fees are negligible. *Id.* ¶ 188. RKA services are uniform among national recordkeepers, who each invest in the technologies that perform the RKA services. *Id.* ¶¶ 174-80. Prudent fiduciaries negotiate fixed per-participant fees rather than asset-based fees, because large, fixed costs can be allocated over larger participant numbers, otherwise an asset-based structure will result in increased fees for participants simply because their assets grew, without relation to the services rendered. *Id.* ¶¶ 176-80, 195 (citing the report of two studies). Industry standards call for RFPs every three to five years, or more often when benchmarking shows above-market pricing. *Id.*, ¶¶ 181-83, 191 (citations omitted).

From 2015 to 2021, the Plan paid excessive per-participant fees ranging between $42 and $65, and, in several years, fees increased despite participant growth, contrary to accepted industry economics. *Id.*, ¶¶ 183, 196–99. The SAC demonstrates that Prudential/Empower provided only ordinary services. Schedule C to the Plan's Form 5500 identifies Prudential's services as: Contract Administrator (Code 13), Recordkeeping and Information Management (Code 15), Participant Loan Processing (Code 37), Direct Payment From the Plan (Code 50; not a service), and Recordkeeping Fees (Code 64). *Id.* ¶¶ 187-89. The DOL defines "contract administrator" as "any individual, partnership, or corporation, responsible for managing the clerical operations (e.g., handling membership rosters, claims payments, maintaining books and records) of the plan on a contractual basis."[2] Thus, codes 13, 15, and 64, all refer to the same bundle of RKA services. Plan

[2] https://www.dol.gov/sites/dolgov/files/ebsa/pdf_files/2021-instructions.pdf ("Instructions")

sponsors have great discretion and essentially no guidance in selecting the recordkeeping codes for the Schedule C. *Id.*, ¶ 189 (citing Form 5500 Instructions). Because Prudential was one of the nation's largest recordkeepers, numerous other national providers identified in the SAC were fully capable of providing identical or superior services. *Id.*, ¶¶ 191-94 (citation to survey omitted). Based on the Plan's fee history, the latest that Defendants should have conducted an RFP was 2020, but Defendants failed to do so, and failed to leverage the Plan's considerable size for reasonable market rates. *Id.* ¶¶ 191-94.

The SAC compares the Plan to similarly sized "Comparator Plans" between 2019 and 2021, all of which reported the same loan-processing service code and at least one of the same general RKA service codes. *Id.* ¶¶ 189-200. Several Comparator Plans reported no indirect compensation, while the remaining Comparator Plans and the Plan itself reported "$0" in indirect compensation, demonstrating that it is proper to calculate direct fees alone. *Id.*, ¶ 200. The Plan should have been able to obtain flat per-participant RKA fees of no more than $26 per participant, and likely even less, based on the average fees of the Comparator Plans. *Id.*, ¶ 204. As alleged previously, because Prudential was "receiv[ing] income from the funds it maintained in the Plan, [Defendants] should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Prudential" (Redline 72), and the Plan's fees did not decrease with the "general trend in the market" of decreasing RKA fees. *Id.*, ¶ 205.

Defendants' fee argument relies on an incomplete, two-page excerpt of a 2021 disclosure document improperly introduced and *not referenced in the pleadings*. *See* App. 061-02. Beyond being unsuitable for resolution on a Rule 12(b)(6) motion,[3] the excerpt contradicts Defendants'

---

[3] Plaintiffs object to the consideration of this mere excerpt of a document, subject to dispute, unable to be authenticated in its partial state, and that was not referenced in, nor central to, the SAC. *Jolley v. Texas Ass'n of Realtors, Inc.*, 2008 WL 11333898, at *2 (W.D. Tex. Aug. 25, 2008) ("Because

own characterization: it explicitly states the 0.04% fee "*[m]ay only apply to some investments*" and disclaims how fees are allocated. App. 062; MTD at 20. Nothing in the improper excerpt supports Defendants' misrepresentation that Participants paid $25 in RKA fees before ad hoc fee are calculated.[4] Plus, Plaintiffs explain the improvidence of asset-based fee structures. SAC ¶ 195. Furthermore, Defendants' attempt to blame fee disparities on loan processing and ad hoc services fails because every Comparator Plan also reported loan-processing services despite similar participant counts. SAC ¶ 200. Defendants do not argue, nor could they at this stage, that the Plan's participants used these services more than other Plans. To the contrary, some Comparator Plans saw participant declines while the Plan had increasing participants, meaning the Comparator Plans would likely have *more* distribution fees than the Plan. *Id*. Furthermore, Defendants' improper exhibit shows that Prudential's $50 loan fee in 2021 vastly exceeded Fidelity's $15 fee for comparable services. Dkt. 40-5 PageID 560; 35-1 PageID 448; SAC ¶ 192.

## III. ARGUMENT

### A. Standard of Review

Separate from the "initial investigation" and selection of an investment, ERISA fiduciaries bear a "continuing duty to monitor" each investment in a plan. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015). "What the appropriate [fiduciary] methods are in a given situation depends on the 'character' and 'aim' of the particular plan and decision at issue and the 'circumstances prevailing' at the time a particular course of action must be investigated and undertaken." *Bussian v. RJR*

---

only a portion was of the Code was attached, which was not the portion referenced in the Complaint, the Court will not consider the document at this stage.").

[4] Even accepting Defendants' (improper) hypothetical that 10% of Plan participants incurred $58,000 in loan fees in 2021, $58,000 equals a negligible 0.008% of the Plan's $735M+ in fees. SAC, ¶ 200. Putting aside the Comparators Plan's loan fees, deducting $58,000 still equals the Plan paying $37 per participant in 2021, far above the alleged $26 reasonable fee. *Id*., ¶¶ 200, 204.

*Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000) (quoting 29 U.S.C. § 1104(a)(1)(B)). In all circumstances, "a trustee cannot ignore the power the trust wields to obtain favorable investment products." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 221 (6th Cir. 2024) (citation omitted).

At this stage, "Plaintiffs' Amended Complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Perkins*, 2024 WL 1574342, *2 (citations omitted). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent" investments and "fail[ing] to take actions that would have reduced [RKA] fees." *Id.*, at *2, 4 (citations omitted). The Fifth Circuit accords with the Seventh Circuit's holding that "the 'difficult tradeoffs' that an ERISA fiduciary faces, and the 'range of reasonable judgments' that may be made" are "alternative explanations [that] need not be conclusively ruled out at the pleadings stage." *Hughes v. Nw. Univ.*, 63 F.4th 615, 632 (7th Cir. 2023) ("*Hughes II*") (quoting *Hughes I*, 595 U.S. at 177); *accord Perkins*, 2024 WL 1574342, at *3. The Supreme Court instructs that ERISA does not grant fiduciaries a "defense-friendly standard," meaning there is no "presumption of prudence" when ruling on a motion to dismiss. *Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014) (internal citations omitted).

### B. The GIC Claims are Plausible

#### 1. The benchmarks are meaningful in the GIC context

This Court has aptly explained that "the Fifth Circuit has yet to define exactly" what a "meaningful benchmark" entails, but "clues from different courts" will assist the analysis. *Eibensteiner*, 2026 WL 1140895, at *3.[5] This Court found *Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018) informative, *id.* at *3n.16, wherein the Eighth Circuit held that the standard for

[5] Notably, "a benchmark for measuring performance" inserts "inherent fact questions [...] [a]nd, importantly, the Fifth Circuit has not imposed a performance-benchmark requirement." *Spence v. Am. Airlines, Inc.*, 718 F. Supp. 3d 612, 619 (N.D. Tex. 2024).

stating a claim depends on whether there are "facts about the funds" that "plaintiffs can research," such as SEC prospectuses for mutual funds, or whether the facts are ones "plaintiffs generally lack" access to, such as GIC contracts. *Meiners*, 898 F.3d at 822–23. The most appropriate cases here involve similar allegations of uncompensated risk, particularly GIC cases, rather than Defendants' cases challenging performance alone. The SAC details three general account GICs alongside other GICs with equal or more favorable termination and withdrawal terms, higher S/L ratios, and similar or lower risk profiles and bargaining power based. SAC ¶¶ 7–9, 12, 98, 110, 139–145, 148, 152–56, 162. The Prudential GIF's uncompensated risk in relation to being general account GIC is an imperative part of Plaintiffs' theory of liability, and thus a keystone of the meaningful comparator analysis. This Court held that the FAC could pass the plausibility threshold if more details regarding risk were added. *Eibensteiner*, 2026 WL 1140895, at **3, 4. Plaintiffs have done so. Defendants do not engage with the critical risk-reward allegations here, despite being on notice from prior briefings that this is a core aspect of Plaintiffs' theory. *See* Dkt. 29, PageID 314, 317-18. Hence, even a cursory review of the SAC disproves Defendants' egregious misrepresentation that the SAC alleges "that every stable value fund is automatically a meaningful comparator for every other stable value fund." MTD at 8.

The Fifth Circuit has held that fiduciaries must be cognizant of the "structure" of the investment, "tak[e] into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment" *Laborers Nat. Pension Fund v. N. Tr. Quantitative Advisors, Inc.*, 173 F.3d 313, 317–18 (5th Cir. 1999), that purchasing an annuity "uncompensated risk" can infer deficient reasoning behind the purchase, and "[r]eliance solely on ratings provided by insurance rating services would not be sufficient. *Bussian*, 223 F.3d at 298-99, 304 n.23; *id*., at 301-02 (risk relates to "the structure" of the product, while agency ratings do not rate a "product," but, rather,

evaluate a company in an unreliable way, varying in "recency" and credibility among "investors and industry insiders."); *see also In re Unisys Sav. Plan Litig*., 74 F.3d 420, 436-37 (3d Cir. 1996) ("*Unisys*") ("the financial condition of" the insurer is an issue for trial).

In more recent and analogous cases, *Payne*, *Lacrosse*, and *Miller*, the "structure, objectives, strategy, and risk profile" were sufficiently similar based on the "structural design" of the general account GICs compared to the other GICs that, by nature, have "same benefits and expectation of returns." *Payne v. Hormel Foods Corp*., 2024 WL 4228613, **6-7 (D. Minn. Sept. 18, 2024); *see also Lacrosse v. Jack Henry & Assocs*., 2024 WL 3564575, at *3 (W.D. Mo. July 11, 2024) (similar); *Miller v. AutoZone, Inc*., No. 19-CV-02779, 2020 WL 6479564, **5-6 (W.D. Tenn. Sept. 18, 2020). Plaintiffs also allege that the Comparator Funds had better S/L ratios, another risk factor that is accepted as true at this stage. SAC ¶ 98; *Perkins*, 2024 WL 1574342, at *2.

Defendants' *speculation* that differences in Prudential's general account portfolio or contract terms might explain the rate disparities improperly asks the Court to accept mere hypotheticals, from outside the SAC, as inferences in Defendants' favor. Accepting a general account GIC despite Prudential's worse general account when other "providers are comparable in their ability to serve the best interests of plan beneficiaries and participants" with better general accounts is imprudent. *Bussian*, 223 F.3d at 302. Relatedly, whether Defendants were "justified and informed" in choosing a provider with worse investment practices or accepting a contract with different terms for significantly worse rates is a matter reserved for trial. *See Unisys*, 74 F.3d at 437. The SAC expressly alleges, that because of the Comparator Funds overall similarities, "any purported difference […] cannot be the reason" for the rate disparities. SAC, ¶¶ 125-53.

Indeed, Defendants mere speculations about the rate disparities are not an "obvious[]" explanations for retaining the Prudential GIF, because any hypothetical "is severely undercut by

the Plaintiffs' allegation that the [rates] were *significantly* [worse] than those of comparable plans." *Perkins*, 2024 WL 1574342, at *3 (emphasis added). What matters is the SAC alleges that "another plausible explanation is that the" Prudential GIF languished in the Plan "due to mismanagement." *Id*. To be sure, the SAC's allegations specifically foreclose the theory that the disparity can be justified by higher "minimum guaranteed crediting rates, frequency of rate-setting, liquidity and withdrawal restrictions." MTD at 9. The SAC alleges liquidity and withdrawal terms for the Prudential GIF and Comparator GICs, and that the Plan had sufficient bargaining power for better rate minimums—or, at the very least, Defendants should have recognized that the Prudential GIF's minimum rate guarantee was too low. SAC ¶ 113. The AC alleges these details to the extent knowable from available information, which is the maximum that ERISA requires. *See Innova Hosp*., 892 F.3d at 730; *Cunningham*, 604 U.S. at 705.

Moreover, withdrawal terms, liquidity, and underlying holdings, "ha[ve] no bearing on the fund's ability to offer higher crediting rates." *Lacrosse*, 2024 WL 3564575, at *3; *see also Miller v. AutoZone, Inc.*, 2020 WL 6479564, at *5-6 (W.D. Tenn. Sept. 18, 2020) (a GIC's "underlying investment portfolio" is neither relevant nor undermines the plausibility of subpar rates); *Wood v. Prudential Ret. Ins*., 2016 WL 5940946, at *4 (D. Conn. Sept. 19, 2016) ("the benchmark and methodology used to set the interest rate, the prevailing rates for comparable investments, and other factors bearing on the reasonableness of the interest rate and the allocation of risk, are fact specific and render dismissal premature now at the motion to dismiss stage."); *Johnson*, 122 F.4th at 218 (plaintiffs need not plead "risk profile, bond to-equity ratio, and investment strategy" of the comparators).

Defendants' other arguments are also undercut by the SAC and improperly ask this Court to accept inferences in Defendants' favor. For example, Defendants erroneously assert that

insurance companies offer affiliated plans better rates than nonaffiliated plans. Yet, the SAC shows insurance companies offering unaffiliated plans *better* rates than their own plans, and all unaffiliated plans have higher rates than the Plan. *See* SAC ¶¶ 119-50 (*e.g.*, the American United Life Insurance Company in 2021). Several cases have upheld comparisons to a provider's offering in its own plan. *See Somers v. Cape Cod Healthcare, Inc*., 2024 WL 4008527, at *5 (D. Mass. Aug. 30, 2024) ("the Lincoln SVF, carries a guaranteed minimum interest rate under Lincoln's own retirement plan that is three times higher than that offered to Plan participants."); *McDonald v. Lab'y Corp. of Am. Holdings*, 2023 WL 4850693, at *3 (M.D.N.C. July 28, 2023) ("The Complaint also compares the LabCorp Plan unfavorably to a plan offered by the recordkeeping provider to its own employees."). Nothing in ERISA incentives insurers to give their employees special pricing. Actually, ERISA only requires providers to offer their employees fair market rates. *See Dupree v. Prudential Ins. Co. of Am*., 2007 WL 2263892, at *40 (S.D. Fla. Aug. 7, 2007).

Defendants likewise cannot rule out Plaintiffs' TIAA Traditional Annuity Fund (TIAA Fund) comparator by arguing that it is a "'guaranteed fixed annuity contract,'" MTD at 11, because the SAC alleges, supported by a DOL publication, that "[s]table value funds can be managed via guaranteed insurance contracts" as "a single group annuity contract." SAC ¶ 54. The plaintiffs in *Lacrosse*, issued after *Meiners*, were able to use the TIAA Traditional Annuity Fund as a comparator for to demonstrate that the plan's general account GIC had unreasonably low rates, especially because the terms of the "TIAA product […] has no bearing on the fund's ability to offer higher crediting rates." *Lacrosse*, 2024 WL 3564575, at *3. The same is true here, especially because the Form 5500 Defendants provide states that the TIAA Fund "is reported at contract value" like the benefit-responsive Prudential GIF. Dkt. 40-4, App. 058.

The TIAA Traditional Annuity Fund is just one of five GICs that repeat every over a decade, SAC ¶ 118, unlike Defendants' case of *Clinton v* where there was no "uniform sample." MTD at 10 n.8 (citing *Clinton v. Baxter Int'l Inc.*, 2025 WL 3470685, at *7 (N.D. Ill. Dec. 3, 2025)). The additional funds, including those Defendants say "appear[] in only a single year between 2019-2023," MTD at 10 n.8, are "GICs with similar characteristics as the Prudential GIF" that supplement the Comparator Funds. SAC ¶ 148.

Defendants' other authorities are also distinguishable. The SAC alleges precisely what was held to be lacking in *Anderson*: risk-reward allegations and "individual real-world investment options" alongside "the entire market." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1030-31 (9th Cir. 2025) *cert. granted sub nom.*, 2026 WL 120679 (U.S. Jan. 16, 2026)[6] (Berzon, J., concurring). Defendants once again materially misrepresent *Barchock*, which *d[id] not compare [the comparators'] returns* with the actual returns of the [challenged] Stable Value Fund." *Barchock v. CVS Health Corp.*, 2017 WL 9324762, at *3 (D.R.I. Jan. 31, 2017), *R. & R. adopted*, 2017 WL 1382517 (D.R.I. Apr. 18, 2017), *aff'd*, 886 F.3d 43 (1st Cir. 2018) (emphasis added). The *Barchock* complaint only compared a general comparison of different asset investment categories, and only compared the challenged investment to averages, not real-world funds. *See Barchock v. CVS Health Corp.*, No. 16-cv-061, Dkt. 30 (D.R.I. Aug. 2, 2016), ¶¶ 56, 64-74. The "objective" discussion in *Barchock* was not about the general objective of all GICs, but was tied to that challenged "fund's stated investment objective of outperforming money market funds," solely because the challenged fund was managed "too much" like a money market fund and was "too conservative," opposite of the uncompensated risk allegations here. *Barchock*, 886 F.3d at 49.

[6] The Supreme Court is poised to decide whether "[t]he extratextual 'meaningful benchmark' requirement adopted by the Ninth Circuit" is a legal error. *Anderson et al v. Intel Corp.*, Petition for a Writ of Certiorari, at 18 (Oct. 20, 2025).

Defendants also point out that *Ellis* was a "summary judgment" decision (MTD at 9 n.7), and it is further distinguishable because the theory was "that Fidelity's 'primary goal here was to prevent competitor access to wrap capacity to enable Fidelity to grow'" in the market backdrop "[a]fter the financial crisis of 2007–2008" where "there was limited wrap capacity available on the market." *Ellis v. Fidelity Management Trust Co*., 883 F.3d 1, 7 (1st Cir. 2018); *c.f.* SAC ¶ 111 ("The marketplace for GICs is robust" and "competitive."). After *Barchock* and *Ellis*, the First Circuit clarified that the safety of an investment is not a defense to imprudence because even "if the investment increases in absolute dollar value" there would still be "a measurable loss of opportunity." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 31 (1st Cir. 2018) ("This more sophisticated view of loss aligns with most people's expectations regarding their financial fiduciaries."); *see also Somers*, 2024 WL 4008527, at 3–4 (applying *Barchock* to successfully allege similar GIC claims using "several allegedly superior alternative options.").[7]

Another fatal error in Defendants' meaningful benchmark arguments is attempting to "parse[] piece by piece'" each comparison "in isolation" from each other, instead of properly viewing the Comparator Funds and SVIA Benchmark interrelatedly, as ERISA and the SAC require. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 n.4 (8th Cir. 2009; SAC ¶¶ 157-58. Although some courts have held that indexes *alone* may not suffice, that is not the case here. To be sure, "industry-wide averages" paired with individual comparator plans' rates is sufficient, and, properly viewed holistically. *Perkins*, 2024 WL 1574342, at *5; *see also Carter v. Sentara Healthcare Fiduciary Comm*., 2025 WL 2427614, at *5 n.7 (E.D. Va. Aug. 11, 2025) (permitting

[7] *Somers*, *Miller*, *Payne*, and *Lacrosse* are indeed more similar than Defendants' other cases, which are either mutual fund cases, or in the case of *Glick* and *Laabs*, had only one comparator without any supporting details. *See Glick v. ThedaCare, Inc.*, 2022 WL 16927749, at *6 (E.D. Wis. Oct. 27, 2022); *Laabs v. Faith Techs., Inc*., 2023 WL 9321358, at *8 (E.D. Wis. Aug. 30, 2023).

the use of "the average rate of similarly situated stable value options" because "plaintiffs do not fail to allege underperformance merely because they use a measure with which the Committee disagrees."). In fact, no "circuit court that has held that a market index can never serve as a meaningful benchmark," *Johnson*, 122 F.4th at 217–18, including the Ninth Circuit in the *Anderson* case that Defendants' misrepresent. *See Anderson*, 137 F.4th at 1025 (the use of an "index" can be inferential for alleging for the challenged fund met its expected risk-reward "tradeoff" but that complaint's index was insufficient); *Brotherston*, 907 F.3d at 32 (approving expert selection as a benchmark an index fund). The SAC, again, preempts the arguments that Defendants raise. The SAC explains that the benchmark overlaps the Class Period, and the data from before the Class Period provides knowable, historical data that Defendants should have considered during the Class Period. SAC ¶¶ 157–59. *See Johnson*, 122 F.4th at 215 ("though United may not be held liable for pre-2015 events, that period may still color the Court's analysis of post-2015 retention."); *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 188 (3d Cir. 2024) (a similar ERISA holding).

Defendants' speculation that cash flows distorted the benchmark merely presents a factual dispute that cannot defeat plausibility or impart inferences in Defendants' favor at the pleading stage, *see Clinton*, 2025 WL 3470685, at *6, *8, especially where the SAC alleges that Prudential GIF also saw compounding growth. SAC ¶ 44.[8] Of course, Defendants ask this Court to commit a

[8] Even accepting Defendants' asserted 3% market return still renders the Prudential GIF's approximately 2.12% average crediting rate materially below the market rate when, given the Prudential GIF's risk structure and bargaining power, it should have *beat* the SVIA Benchmark. SAC ¶¶ 154, 159; *Walter v. Kerry Inc.,* 2022 WL 1720095, at *3 (E.D. Wis. May 27, 2022) ("A plan that large does not necessarily establish a prudent process as a matter of law simply by hitting [] average" returns); *Somers*, 2024 WL 4008527, at 3–4 (0.07% disparity sufficient in a GIC case); *Payne*, 2024 WL 4228613, at 6–7 (0.71% disparity sufficient); *c.f.*, *Fezer v. Lockheed Martin Corp.*, 2026 WL 1041276, at *7 (D. Md. Apr. 16, 2026) ("Drawing such a [minimum

legal error in accepting their version of events at this stage. *Perkins*, 2024 WL 1574342, at *2; *Allen v. GreatBanc Tr. Co*., 835 F.3d 670, 680 (7th Cir. 2016) (it is "take[n] as true" that "the interest rate" was "unreasonabl[e].").

**2. The SAC alleges imprudent GIC monitoring processes**

Given the chronic and multifaceted issues with the Prudential GIF, which spanned nearly a decade, there is enough to infer that Defendants' deficient and/or unscrupulous processes were "not within a 'range of reasonable judgments'" fiduciaries make. *Carter*, 2025 WL 2427614, at *5 (quoting *Hughes*, 595 U.S. at 177). "In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." SAC ¶ 77 (quoting *Sacerdote v. New York Univ*., 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in *Sacerdote*). Defendants' fiduciary process arguments fail to engage with allegations that Defendants' processes led to the overextended retention of a GIC whose rates were not commensurate with its structure as a general account GIC, and Defendants did not effectively wield the Plan's size-leverage and conduct timely, adequate negations and bidding, despite repeated opportunities to do so.

To start, Defendants should have recognized the general account structure of the Prudential GIF warranted higher rates, and Prudential/Empower's S/L ratio deviated significantly from industry norms for for-profit insurers, another reason why the Prudential GIF's was "not worth" the subpar rates. SAC ¶ 97; *see also Bussian*, 223 F.3d at 298–99; *Laborers Nat. Pension Fund*, 173 F.3d at 317–18. The court in *Konya v. Lockheed Martin Corp*. upheld materially similar allegations where the annuity provider had a low S/R ratio and used a "reinsurer operating offshore

---

underperformance] rule from various district court cases is problematic in part because the metrics used to assess underperformance differ across cases.").

in Bermuda where oversight is less stringent" while this practice has "raised concerns among lawmakers and industry experts," exactly like the allegations here. *Konya v. Lockheed Martin Corp.*, No. CV 24-750, 2025 WL 962066, at *9 (D. Md. Mar. 28, 2025); *see also Unisys*, 74 F.3d at 436-37 (fiduciaries' investigations into the financial soundness of insurers is an issue for trial).

Secondly, it is well settled that imprudent processes are plausibly alleged when a "plan is relatively large and that plans of such size have substantial bargaining power in the highly competitive 401(k) marketplace" but the defendants failed to leverage that power. *Braden*, 588 F.3d at 590; *Johnson*, 122 F.4th at 220; *Hughes II*, 63 F.4th at 632. This is true in GIC cases as well. *See Payne*, 2024 WL 4228613, at *8 ("a prudent fiduciary would have leveraged the size of the plan to either negotiate a better deal" for the GIC or "replace it."); *Carter*, 2025 WL 2427614, at *6.

The SAC enhances the process allegations by explaining how the terms of the Prudential GIF permitted negotiations, withdrawals to better investments, and semi-annual opportunities for improvement, yet these opportunities were squandered by Defendants for over a decade. *See* SAC ¶¶ 104, 118. Because contractual rates are guaranteed, negotiable, and set in advance, courts recognize that that there is a plausible inference of imprudent processes using foresight, not hindsight, in similar GIC cases. *See Wood*, 2016 WL 5940946, at *1; *Miller*, 2020 WL 6479564, at *6; *Disselkamp v. Norton Healthcare, Inc.*, 2019 WL 3536038, at *8 (W.D. Ky. Aug. 2, 2019); *see also Allen*, 835 F.3d at 680 ("whether the 22% decline in value […] was the result of normal economic forces or something more sinister is a matter for a later stage.").[9] Alleging publicly

[9] Defendants' cases did not involved uncompensated risk allegations and had far less robust comparisons. *See Lalonde v. Mass. Mutual Ins. Co.*, 728 F. Supp. 3d 141, 156-57 (D. Mass. Mar. 29, 2024); *Sandoval v. Exela Enter. Sols., Inc.*, 2020 WL 9259108, at *7 (D. Conn. Mar. 30, 2020).

knowable information "and underperformance" presents "a 'foresight-over-hindsight perspective'" that infers a "deficient process." *Johnson*, 122 F.4th at 220.

Third, ERISA fiduciaries must "remove imprudent investments within a *reasonable* period of time." *Tibble*, 575 U.S. at 530 (emphasis added). Here, the Prudential GIF was removed "too little too late." SAC ¶¶ 103 n.21, 118. Defendants' eventual, belated replacement of the fund after more than a decade of underperformance does not shield them from liability at this stage. *See Fuller v. SunTrust Banks, Inc.*, 2019 WL 5448206, at *27 (N.D. Ga. Oct. 3, 2019) (eventual "removal" not enough to warrant dismissal); *Schuster v. Swinerton Inc.*, 2025 WL 1069887, at *5 (N.D. Cal. Apr. 8, 2025) (arguments about "the switch" in providers […] improperly requires the Court to draw inferences in [Defendants'] favor."). Lastly, Defendants fail to acknowledge that "the terms and conditions of the GIC contracts" MTD at 15, is expressly ruled out as a reason for the unjustifiable rates, but need not be alleged before discovery. *See* SAC, ¶¶ 59, 105, 113 152-53, 163; *Innova Hosp.*, 892 F.3d at 730; *Perkins*, 2024 WL 1574342, at *2.

### C. Plaintiffs Sufficiently State their RKA Fee Allegations

#### 1. The amended pleadings are permissible

Defendants' arguments against the amended RKA fee allegation fail for a number of important reasons. As a matter of law, the new allegations may "be considered as properly introduced" because Defendants will not "be prejudiced by allowing the change." *U.S. ex rel. Mathews v. HealthSouth Corp.*, 332 F.3d 293, 295 (5th Cir. 2003). If there is "no prejudice in allowing Plaintiff[s] to add new claims or theories arising out of the same set of facts," then there is less prejudice here, where Plaintiffs do not add new claims or theories, while keeping many of the same key facts. *Greenwald v. Cantrell*, 2023 WL 8827768, at *3 (E.D. La. Dec. 21, 2023); *see*

*also Bullock v. Smith*, 2008 WL 294544, at *1 (N.D. Miss. Jan. 31, 2008) ("no prejudice befalls the defendants because they already knew about the allegations.").

Defendants' scope objection fails because: (1) the SAC's excessive fee prudence allegations arise from, and reallege, the same nucleus of operative facts as before; (2) the SAC narrows the claims for relief to just the preexisting fiduciary breach claim; (3) the change now places a greater burden on Plaintiffs to additionally prove imprudent processes; and (4) discovery has not begun yet. *See* Redline 66-69; *Alas v. AT&T Inc.*, 2026 WL 1671492, at *14-15 (C.D. Cal. June 4, 2026) ("Plaintiffs' duty of prudence claim should be treated the same as their prohibited transactions claim."). Defendants cannot genuinely claim prejudice or any basis to strike the new allegations, especially since they have been on notice of Plaintiffs' theory of liability and are able to raise arguments for dismissal on the merits.[10]

**2. The Comparator Plans are meaningful**

In *Perkins*, the Fifth Circuit held an excessive RKA fee complaint plausibly alleged imprudence by pleading that "as the number of participants in a plan increases, the per-participant cost for recordkeeping services decreases," and it rejected the defendants' attempts to litigate "the specific services rendered in exchange for fees" at the pleading stage. *Perkins*, 2024 WL 1574342, at **4–5. As here, the allegations in *Perkins* relied on Form 5500 service codes for "recordkeeping fees services," and any differences in codes "cannot account for [the] discrepancy" in fees. *Id.* at *4 n.6; *see also Mator*, 102 F.4th at 186. In addition to upholding the use of Comparator Plans, numerous courts recognize the fungibility of services and the relationship between participant counts and fees provides sufficient context for service and fee comparisons. *See Hughes II*, 63

[10] This Court's prior holding in *Villareal v. Navistar, Inc.* is dissimilar because that plaintiffs already "filed five complaints and sought to file two more" with "sweeping changes" including changes to the "alternative[s]." 2022 WL 14708977, at *1, 3 (N.D. Tex. Mar. 8, 2022).

F.4th at 632; *Mator*, 102 F.4th at 187–89; *Braden*, 588 F.3d at 601 n.9. Importantly, *Perkins* instructs that any counter-factual hypotheticals are "severely undercut" where, as here, the Plan's fees are significantly higher than comparable plans. *Perkins*, 2024 WL 1574342, at *3.

The SAC pleads twelve comparisons across six plans, which is more than sufficient. *See Cina v. Cemex, Inc.*, 2025 WL 2294331, at *2 (S.D. Tex. Aug. 8, 2025) (two plans sufficient); *Ulch v. Se. Grocers LLC*, 2026 WL 1243069, at *3 (M.D. Fla. May 6, 2026) (five sufficient); *Mator*, 102 F.4th at 187 ("Four does not seem insufficient."). Defendants do not provide a single case in support of their criticism. Courts reject the notion that plaintiffs must select more comparators simply because "hundreds of thousands" of plans exist, especially where, as here, the "overwhelming majority" of plans are far smaller than the Plan, and matching comparable services further narrows the appropriate comparator pool. *Rodriguez v. Hy-Vee, Inc.*, 2022 WL 16648825, at *10 (S.D. Iowa Oct. 21, 2022).

Additionally, Defendants' speculation about undisclosed indirect fees also ignores that the Plan and each Comparator Plan reported $0 indirect compensation, *see* SAC ¶ 200, and improperly asks the Court to engage in non-obvious calculations and assumptions—an approach "not appropriate" on a Rule 12(b)(6) motion. *Rodriguez*, 2022 WL 16648825, at *9 (quoting *Braden*, 588 F.3d at 595). Alleging solely direct fee comparisons is legally permissible. Plaintiffs need not plead "the specific amount of indirect fees" where those amounts are "not disclosed" and "it is impossible, at this juncture" to provide them. *Cina*, 2025 WL 2294331, at *5; *see also Ulch*, 2026 WL 1243069, at *3; *Stewart v. Nextera Energy, Inc.*, 2025 WL 3098085, at *5 (S.D. Fla. Aug. 14, 2025); *Mator*, 102 F.4th at 181–82.[11]

[11] *Singh* did not involve direct-to-direct fee comparisons for all years, unlike here. *See Singh v. Deloitte LLP*, 123 F.4th 88, 92 (2d Cir. 2024).

Defendants' ancillary-services theory is also legally and factually meritless, *see* §§ II.C, *supra*. *Pursuant to Perkins, it is accepted as true that "fees for those services are negligible" and cannot explain the fee discrepancy*. *Perkins*, 2024 WL 1574342, at *4 n.6. This principle is more pronounced in the instance case because every Comparator Plan entered service code "37" for loan processing, unlike in *Perkins*. *See id.*; SAC ¶ 200. The Comparator Plans also had the same services as the Plan, although they did not use the same exact codes, as explained in the SAC. SAC ¶ 198; § II.C, *supra*.[12] At most, and properly drawing inferences in Plaintiffs' favor, any loan-related charges were themselves excessive, which not a justification for the overall disparity. *See Stewart*, 2025 WL 3098085, at *3 n. 8 (rejecting fee arguments about "supplement services"); *Dayak v. Reyes Holdings, LLC*, 2026 WL 881653, at *5 (N.D. Ill. Mar. 31, 2026) (no dismissal where the defendants' version of events "would have still resulted in excessive recordkeeping fees."). Defendants' attempt to recharacterize the fee data, especially by misrepresenting their excerpt, is readily incorrect, *see* § II.C, *supra*, and is, at least, a disputed factual issue not suitable for judicial notice or resolution on a motion to dismiss. *See Schuster*, 2025 WL 1069887, at *5 ("[T]he Court take judicial notice of any disputed facts" for the interpretation of RKA fees).

Fourth, Plaintiffs do not rely on "vague and conclusory" (MTD at 22) allegations regarding provider quality, because the SAC cites industry sources establishing that the Comparator Plans used Top-10 national recordkeepers investing in the technology and infrastructure necessary to provide the same or better services. SAC ¶¶ 179, 192, 194. Courts accept as true that "commercially available" alternatives are "managed by" the same or better providers, and provider

[12] In *Peeler,* the plaintiffs did not "explain this discrepancy" between codes, unlike Plaintiffs' here. *Peeler v. Bayada Home Health Care, Inc*., 2026 WL 208630, at *9 (W.D.N.C. Jan. 27, 2026). *See* SAC ¶ 198; § II.C, *supra.*

quality is a fact question. *Dayak*, 2026 WL 881653, at *7; *Bussian*, 223 F.3d at 307 (quality of the provider is a fact question).

The fact that "the Plan switched to Fidelity for recordkeeping services and paid a much lower [] fee" in 2023, without "a reduction in the level or quality of retirement plan services," bolsters allegations "that the services offered by Fidelity (and other large recordkeepers) are substantially similar in all material respects to the services offered by" Prudential/Empower." *Mator*, 102 F.4th at 181; *see also Stewart*, 2025 WL 3098085, at *3.

**3. The SAC alleges imprudent RKA monitoring processes**

Defendants did not, as ERISA requires, "defray[] reasonable expenses of administering the plan" and act with the standard of "care" 29 U.S.C. § 1104(a), "within a reasonable time." *Hughes I*, 595 U.S. at 176. Specifically, Defendants did not timely conduct RFPs, leverage the Plan's size, and correct persistent, above-market fees despite a decade-long industry trend of decreasing fees. Courts reject similar attempts to dismiss duty of prudence claims where fiduciaries failed to take steps to control RKA fees, especially RFPs. *See Perkins*, 2024 WL 157434, at *4 & n.7; *Hughes II*, 63 F.4th at 621-22 (defendants failed to "solicit[] bids" and leverage the plans' "massive size."); *Mator*, 102 F.4th at 180; *Somers*, 2024 WL 4008527, at *5.

The Plan's fee history from 2015 onward shows that the excessive fees began "well before the start of the Class Period up to at least 2021" but more likely 2022. SAC ¶ 196. Rather than undermining Plaintiffs' claims, Defendants' belated fee reductions bolster the inference of imprudence. *See Mator*, 102 F.4th at 181. The "timeline" of the fees "warrants skepticism" as to Defendants' counter-factual, because "wait[ing] more than three years to negotiate a reduction in fees" points to injudicious processes. *Alas*, 2026 WL 1671492, at *10. Under the same principle, fluctuating fees does not "suggest[]" prudence, MTD at 24, because the Plan's fees *increased* when

they should have *decreased*, and any reductions were insufficient to bring rates to a reasonable level. SAC ¶¶ 196, 200. That "fees fell" at certain points does not provide an "alternative explanation" that is "more reasonable or better supported than the [Plaintiffs'] theory of misconduct, given the magnitude of the differences in fees." *Mator*, 102 F.4th at 189; *see also Perkins*, 2024 WL 1574342, at *4.[13]

Lastly, it is accepted as true that there has been a "general trend of recordkeeping costs decreasing over time." *Silva v. Evonik Corp*., 2020 WL 12574912, at *7 (D.N.J. Dec. 30, 2020); *Stewart*, 2025 WL 3098085, at *3. Several of the Comparator Plans experienced fee decreases, with any marginal increases attributable to the additional code 71 for commissions. *See* SAC, ¶ 200.

Ultimately, Defendants' argument, "that it did in fact employ a prudent process, this argument goes to the merits and is misplaced at this early stage." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019).

### D. Plaintiffs Plausibly Allege their Duty to Monitor Claim

Because Plaintiffs' duty of prudence claim is sufficient, so too is Plaintiffs' derivative duty to monitor claim. *Anderson v. Sw. Airlines Co*., 2026 WL 820860, at *4 (N.D. Tex. Mar. 25, 2026).

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss, or in the alternative grant Plaintiffs leave to amend.

Dated: July 28, 2026 Respectfully submitted,

[13] Defendants' out-of-Circuit cases seemingly alleged timely and effective RFPs. *See Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1156–58 (10th Cir. 2023) ("the allegations show[ed] the Committee 'regularly re-negotiated their fee arrangement" and the fiduciaries re-negotiated fees three times in five years, obtaining at least a $15 reduction each time); *Lalonde*, 728 F. Supp. 3d at 149, 158 (alleging two RFPs); *Brewer v. All. Coal, LLC*, 2025 WL 3527171, at *7 (N.D. Okla. Dec. 9, 2025) (reductions of roughly $30 and $90 dollars).

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
(Admitted *Pro Hac Vice*)
James A. Maro, Esquire
(Admitted *Pro Hac Vice*)
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200

Daniel L. White, Esquire
TX Attorney ID #24090588
**WARD + WHITE PLLC**
114 ½ E. Louisianna Street
Suite 206
McKinney, TX 75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 941-0040

*Counsel for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2026, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/Mark K. Gyandoh*
Mark K. Gyandoh, Esq.